# EXHIBIT B



UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **ROBERT M. HARTRANFT, JR.,** | : | **DOCKET NO. 3:01CV1870(GLG)** |
| **Plaintiff,** | : | |
| | : | |
| **vs.** | : | |
| | : | |
| **HARTFORD LIFE AND ACCIDENT** | : | |
| **INSURANCE CO. and HSB GROUP, INC.** | : | |
| **Defendants.** | : | **November 20, 2003** |

## AFFIDAVIT OF JUDITH D. MEYER

The undersigned, being duly sworn, hereby deposes and states:

1.  I am over the age of eighteen years and I understand the meaning and obligations of an oath.

2.  I have first-hand knowledge of the facts stated herein.

3.  I am an attorney admitted to this Court and I represent the plaintiff in the above-captioned matter.

4.  Exhibit C attached to this Motion in Limine is a portion of the transcript of Jodi Lussier, the witness produced by Defendant HSB Group, Inc. ("HSB") in response to a notice of its deposition, with several exhibits thereto.

5.  Exhibit D attached to this Motion in Limine is a portion of the transcript of Antoinette G. Adamowicz, the witness produced by Defendant Hartford Life and Accident Insurance Co. ("HLI") in response to a notice of its deposition, with several exhibits thereto.

6.  The letter attached as Exhibit 1 to this Affidavit is the denial of plaintiff's final administrative appeal in this matter, which was received in my office from HLI.

7.  The documents attached as Exhibit 2 were provided in response to my request for all documents related to the "Panel Medical Records Review."

Page 1 of 2



8.    Exhibit 3 to this Affidavit is a portion of the discovery responses provided by HLI in response to questions about its business relationship with "University Disability Consortium," a company that appears to have provided physician reviewers to HLI.

_Judith D. Meyer_

STATE OF CONNECTICUT:
                                        : ss.  Avon
COUNTY OF HARTFORD  :

The foregoing was sworn to and subscribed before me this 20th day of November, 2003.

_Michael R. Levin_
Commissioner, Superior Court

Page 2 of 2

**EXHIBIT 1**



Hartford Life

August 1, 2001

Ms. Judith D. Meyer
Law Office of Judith D. Meyer
152 Simsbury Road
P.O. Box 451
Avon, CT 06001-0451

Re :   **Robert M. Hartranft, Jr.**
       SS No.     :    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
       Policy No.  :    GLT 208185
       Policyholder  :    HSB Group, Inc.

Dear Ms. Meyer:

We are writing to you regarding the appeal of our decision to deny your client's claim for long term disability ("LTD") benefits under the above captioned Hartford policy ("Policy").

Under the terms of this policy, your client is entitled to an independent review of the claim facts and the determination made regarding his eligibility for benefits. The file was referred to our Appeal Unit to conduct such a review. This review has been conducted separately from the individuals who made the original decision to deny benefits. Specifically, your letter of appeal, all subsequent letters, additionally provided information, and information already existing in the claim file have been reviewed. We had all medical information and after acquired documentation reviewed by a physician with the University Disability Consortium. In addition, we contacted some of Mr. Hartranft's attending physicians directly to discuss this claim.

Our determination has remained that the documentation on file, taken as a whole, supports our original decision. Therefore, we must uphold our decision to deny Mr. Hartranft's claim for LTD benefits.

Please refer to our February 8, 2001 letter (copy enclosed) which lists the Policy provisions that apply to this claim and also lists the evidence contained in the claim file used to make our original determination.

Hartford Life
200 Hopmeadow Street
Simsbury, CT 06089
860 525 8555   1

Mailing Address: P.O. Box 2999
Hartford, CT 06104-2999

As referenced in this letter, in order to be considered eligible for LTD benefits, an Insured must meet the group policy definition. This Policy defines Total Disability during the Elimination Period and the first 24 months for which benefits are potentially payable as being prevented from *"performing the essential duties of your occupation"*.

An Elimination Period is a period of consecutive days of Total Disability for which no benefit is payable. The group policy identifies the Elimination Period as the last to be satisfied of the following:

> *(1) the first 180 consecutive days of any one period of Disability; or*

> *(2) with the exception of benefits required by state law, the expiration of any Employer sponsored short term disability benefits or salary continuation program.*

As you are aware, Mr. Hartranft ceased working as of February 16, 1999. As 180 consecutive days was the last condition to be satisfied, Mr. Hartranft's Elimination Period would have been satisfied as of August 16, 1999. In addition, the Policy stipulates that a monthly benefit will not be paid until an Insured satisfies the following criteria:

> *(1) you become Disabled while insured under this plan;*

> *(2) you are Disabled throughout the Elimination Period;*

> *(3) you remain disabled beyond the Elimination Period;*

> *(4) you are, and have been during the Elimination Period, under the Regular care of a Physician; and*

> *(5) you submit proof of loss satisfactory to the Hartford.*

As such, we must determine if Mr. Hartranft has submitted satisfactory proof of Total Disability through the applicable Elimination Period.

Please be advised that the Policy under which Mr. Hartranft had been covered is intended to provide a benefit for individuals who are unable to perform the essential duties of their occupation. The Policy is not, necessarily, intended to provide a benefit if an individual is unable to perform the essential duties of their job, position or work situation with a particular employer. The difference between an occupation and a job being that an occupation is a vocation or profession as it typically exists in the general labor market whereas a job is a set of specific tasks performed for a specific employer. The information on file indicates that Mr. Hartranft had been employed as a Principle Engineer described by his prior employer as requiring sedentary level work capacity.

2

In addition, please be aware that we must evaluate Mr. Hartranft's condition at the time he ceased work and during the subsequent Elimination Period. The records supplied indicate that Mr. Hartranft has claimed limitations due to various conditions including increased low back pain and a lumbar fracture caused by an accident. However, this accident took place well after Mr. Hartranft's last day worked and satisfaction of the Policy's Elimination Period in September of 1999. In fact, the circumstances of the accident suggest that Mr. Hartranft was quite active at that time. Namely, the accident was described in Dr. Reik's notes as follows:

> "[Mr. Hartranft] somehow managed to fall out of a pine tree while trying to remove dead limbs with a chain saw…"

Therefore, while it is unfortunate that Mr. Hartranft suffered such injuries, his increased low back pain and lumbar fracture has not been considered in this review. In fact, his activities of tree climbing and removing branches with a chain saw demonstrate significant physical capabilities at that time.

As of Mr. Hartranft's last day worked, his initial application indicates that he ceased work due to complaints of tiredness and lack of endurance resulting in needing to take longer breaks. These symptoms had been attributed at that time to a diagnosis of Chronic Fatigue Syndrome ('CFS') and a significant history for Parkinson's Disease and depression. Mr. Hartranft was treated by various physicians for his complaints and conditions.

As part of the initial claims application, Dr. Cappadona completed an Attending Physician's Statement on September 8, 2000. This form lists Mr. Hartranft's primary diagnosis as Parkinson's Disease that had led to symptoms of tiredness, tremor, poor balance, sleep disturbance, and depression. Dr. Cappadona also indicates that Mr. Hartranft was originally diagnosed in 1988, and received treatment from his office since 1991. Since, Dr. Cappadona denotes increased frequency of treatment which at that time was weekly to monthly.

The records submitted by Dr. Cappadona commence in October 1998. At that time, reference is made to an evaluation by Dr. Reik for Parkinson's Disease and complaints of difficulty sleeping, headaches, exhaustion, back pain and gastrointestinal disease. By December 1998, Mr. Hartranft called Dr. Cappadona to inform that he was improved on medication. On January 18, 1999, Dr. Cappadona reports that Mr. Hartranft had been experiencing job related stress. By February 1, 1999, an office note indicates that Mr. Hartranft was *"losing his job."* On his next visit of February 19, 1999, Mr. Hartranft made no reference to the complaints which he stated had caused his ceasing work just three days prior. Specifically, at that time, Mr. Hartranft only complained of a sore throat and commented that his fatigue was minimal. Therefore, there is no record of restrictions that would have prevented Mr. Hartranft from performing the essential duties of his occupation on his last day work. In fact, the record supports that Mr. Hartranft ceased work because his position was terminated rather than caused by medical necessity. In fact, the initial Employer's Statement submitted by HSB, Inc's Benefits Consultant's lists Mr. Hartranft's reason for leaving employment as job elimination and that Mr. Hartranft was notified on December 1, 1998 that his position was being eliminated.

3

In addition, Dr. Cappadona had referred Mr. Hartranft to Drs. Bozzuto and Reik for consultation. Dr. Bozzuto's March 1999 consultation references Mr. Hartranft's history of Parkinson's Disease, Lyme Disease, dysthymia and major depression. Dr. Bozzuto indicates that Mr. Hartranft's psychological stressors from employment problems had contributed to his complaints of depression and decreased energy. At that time, Dr. Bozzuto had already noted *"significant improvement"* commenting that, *"[m]any of [Mr. Hartranft's] symptoms have begun to subside."* There is no indication from the records that Mr. Hartranft had been restricted from work performance due to depression for which he had successfully treated with medication.

The records provided also document referrals to Dr. Reik prior to and after Mr. Hartranft ceased working. On December 9, 1998, Dr. Reik noted that Mr. Hartranft was able to get out of his chair without using hands on first attempt, had a normal stride, but did demonstrate diminished hand movements. At that time, Mr. Hartranft reported his own restrictions as an inability to work fifty-five (55) hours per week although he reported being able to and continued to work his scheduled forty (40) hour work weeks. By January 6, 1999, Dr. Reik documents that a prior increase in Mr. Hartranft's medications had improved his energy and outlook. There is no record of subsequent visits with Dr. Reik for more than a year, not until April 12, 200. At that time, Dr. Reik notes that Mr. Hartranft had lost his job and opines of his condition; *"He is actually doing acceptably in terms of his Parkinson's Disease."* Again, there is not satisfactory proof of restrictions that would have prevented Mr. Hartranft from performing the essential duties of his sedentary occupation at the time he ceased work

Furthermore, these records do not satisfactorily prove restrictions and limitations from performing the material duties of a sedentary occupation beyond the Elimination Period. On March 11, 1999, Dr. Cappadona notes complaints of fatigue and sleep of 10 to 11 hours per night. By April 9, 1999, Dr. Cappadona indicates that Mr. Hartranft's fatigue had been generally better. A subsequent note in April indicates that stress seems to be an exacerbating factor of Mr. Hartranft's CFS.

On May 17, 1999, Dr. Cappadona reports that Mr. Hartranft had obtained a consulting job but subjectively did not feel ready to work because of fatigue. Also at this time, notes refer to Mr. Hartranft's surgery on one of his fingers (specifically, right fifth ray surgery performed by Dr. Mara). By June 1, 1999, records denote almost full flexion of all digits and do not support significant restrictions. In addition, office notes from late 1999 primarily deal with the lumbar fracture and broken rib following Mr. Hartranft's fall from a tree. Otherwise, only primary care and a flu vaccine is referenced. By January 4, 2000, Dr. Cappadona only references low back pain following this accident in a restrictive manner. Otherwise, he documents that Mr. Hartranft is doing better with stable Parkinson's Disease. By November 17, 2000, the records document that all of Mr. Hartranft's *"Parkinson's symptoms are not bad"* and improved energy is reported.

As such, there is not satisfactory proof of a Disability for 180 consecutive days following Mr. Hartranft's last day worked.

4

In addition, in your April 7, 2001 letter you point out that Dr. Cappadona's April 10, 2000 report indicates that Mr. Hartranft's condition had generally decreased from 1999. This is obviously the case, however, the superceding event of falling out of a tree with a chain saw leading to a lumbar and rib fracture occurred after the last day worked and satisfaction of the Elimination Period. Again, we must assess Mr. Hartranft's capabilities as of his last day worked. Your letter also refers to our decision as a *personal interpretation* of the information on file. Please be aware that the decision made was objectively made by trained claims personnel with sound judgement. However, to be of service to you and your client, we also have the medical documentation on file reviewed by a physician from University Disability Consortium ('UDC'). In addition to this information being reviewed, Drs. Cappadona and Reik were also contacted directly.

The qualified medical personnel from UDC initially found that Mr. Hartranft's reported symptoms do not meet the definition of CFS. The Center for Disease Control defines CFS as a constellation of symptoms with associated severe disabling fatigue. However, a diagnosis of CFS should not be made in the presence of an active medical condition which could explain complaints of fatigue such as hypothyroidism, sleep apnea, or a history of major depression. As you are aware, Mr. Hartranft had a history of dysthymia and major depression. The records on file do not support restrictions due to a mental nervous disorder, which had been sporadically treated and controlled with medication.

In Mr. Hartranft's case, his history of Parkinson's Disease may also explain his subsequent CFS complaints. Further evaluation of Mr. Hartranft's Parkinson's Disease revealed some progression, however, the degree of symptoms remained mild to moderate. In fact, with an increase in medications, Mr. Hartranft was substantially improved in his energy and outlook by January 16, 1999. This is prior to his last day worked, yet after he was reportedly notified that his position was to be eliminated. Also of note, there were no subsequent neurological office visits until April 2000. This review revealed that Mr. Hartranft's condition at the time he ceased working would have been limiting to some extent, but would not account for preclusion from performing the essential duties of his occupation. In fact, a conversation documented with Dr. Reik indicates his opinion of Mr. Hartranft's Parkinson's Disease at the time he ceased work as including mild motor aspects with the ability to perform in a light duty capacity of a full time basis in relation to that diagnosis.

While it appears that Mr. Hartranft had a long history of diagnoses leading up to his job being eliminated, there is no evidence to suggest that his symptoms increased in severity rendering him unable to perform the essential duties of his sedentary occupation and prompting him to stop working. In addition, assuming Mr. Hartranft had satisfied the initial definition of Disability when he ceased work, the medical records on file indicate that his complaints were improved with medication and would not have continually preventing him from working through and beyond the August 16, 1999 Elimination Period. Accordingly, we must conclude that Mr. Hartranft has not satisfied the definition of Disability, has not completed the applicable Elimination Period, and our prior decision to deny benefits was appropriate given the information on file.

5

We regret that our decision could not have been more favorable to your client, however, we are limited by the provisions of the policy. Nothing in this letter should be construed as a waiver of any of the Hartford's rights and defenses under the above captioned policy, and all of these rights and defenses are reserved to the Hartford, whether or not specifically mentioned herein.

Please be advised that our claim decision is now final as you have exhausted any administrative remedies available to you under the policy.

Sincerely,

Robert R. Dombrowski, Jr., Appeal Specialist
Benefit Management Services
Hartford Life and Accident Insurance Company

6

**EXHIBIT 2**

August 29, 2001



Judith D. Meyer
152 Simsbury Road
P.O. Box 451
Avon, CT 06001-0451

Hartford Life

Re:    Claimant        :    Robert M. Hartranft, Jr.
       S.S. No.        :    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
       Policy Holder   :    HSB Group, Inc.
       Policy No.      :    GLT 208185

Dear Ms. Meyer:

As requested by your letter of August 10, 2001, enclosed are copies of all pertinent documents on Mr. Hartranft's file not available at the time of your previous request. Specifically, the enclosed information consists of a review of medical records by physicians from the University Disability Consortium including conversations with Drs. Cappadona and Reik as documented in letter form.

If you have any questions or require additional information, please feel free to contact our office.

Sincerely,

Robert R. Dombrowski, Jr., Appeal Specialist
Benefit Management Services
Hartford Life and accident Insurance Company

Hartford Life
200 Hopmeadow Street
Simsbury, CT 06089
860 525 8555

Mailing Address: P.O. Box 2999
Hartford, CT 06104-2999

# UNIVERSITY DISABILITY CONSORTIUM

*Physician Specialists for Disability Evaluation and Management*

July 16, 2001

Rob Dombrowski
HARTFORD LIFE
200 Hopmeadow Street
Simsbury, CT  06089

Re:  **Claimant:**    **Robert Hartranft**
     **SS#:**    **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**

### PANEL MEDICAL RECORDS REVIEW

### *INTERNAL MEDICINE REVIEW*

I reviewed the medical records of Robert Hartranft with regard to restrictions and limitations from his occupation as a nuclear engineer as of February of 1999, the date of onset of the disability claim.  This report will deal with the following claimed disabling conditions as per the attending physician and Mr. Hartranft; chronic fatigue syndrome, headaches and depression.  A separate neurologic evaluation has been conducted with regard to the claim of restrictions and low back pain.  Mr. Hartranft, currently a 58-year-old male, was employed as a nuclear engineer by the HSB Group, Inc.  His job description by DOL Labor Categories is of a sedentary one.  He last worked on 2/16/99 with a disability date onset of 2/17/99 and a benefit effective date of 8/16/99.  This evaluation is for his own job.

According to an AP statement completed on 9/8/00 by Dr. Hartranft's treating physician, Dr. John Cappadona, a family medicine and internal medicine physician, Mr. Hartranft suffered from Parkinson's disease, sleep disturbance, depression, fatigue, and a diagnosis of chronic fatigue syndrome was noted.  He is stated to have been unable to "sustain focused effort."  According to several statements by co-workers of Mr. Hartranft, this decrease in cognitive functioning manifested itself towards the latter part of 1998 and

ADMINISTRATIVE OFFICES • 173 Lincoln Street • Newton Highlands, Massachusetts 02461-1501 • 617.527.1855 • Fax 617.527.2570 • Email UDC@UDC1.com

resulted in decreased ability to work and that his work time declined from approximately 55 hours per week to 40 hours per week.

**REVIEW OF MEDICAL RECORDS:**    Records of Dr. Cappadona beginning in October of 1997 are reviewed.  These records are difficult to read due to legibility and poor handwriting.  On 10/26/98 (the first visit since 10/27/97) Mr. Hartranft was noted to be complaining of difficulty sleeping, headaches, exhaustion, gastrointestinal distress. He was scheduled to be followed up by his neurologist at the University of Connecticut (Dr. Reik) and a referral was processed.  A note by Dr. Cappadona states that Mr. Hartranft suffered a fall on the sidewalk approximately five days prior and had some contusions and abrasions.  There is an Emergency Room note related to this fall.  There apparently was no fracture.  A note regarding a psychiatric referral was noted in this office note.

On 10/18/98 Mr. Hartranft was seen for acute low back pain without any injury.  A reference to a strain was made in this note.  There is also reference to an evaluation to Dr. Reik regarding Mr. Hartranft's Parkinson's disease.  This note is limited and difficult to read.

A follow-up evaluation by Dr. Reik on 12/9/98 states that Mr. Hartranft was having difficulty with his Parkinson's disease with slowing in the morning and increased tremor and balance difficulty as well as difficulty in falling asleep and waking up in the morning. There were also references to exhaustion where he would sleep for "14 hours a day for four days at a time.  He has noted that he has difficulty in getting off the toilet and that these disabilities are impacting his work.  He no longer is able to work his usual 55 hours a week, but is now down into the 40s."

On a follow-up visit of 1/6/99 to Dr. Reik, he was noted to have "substantially improved in his energy and outlook" after a change in his Parkinson's medications.    His sleep disorder was discussed and a tricyclic antidepressant was planned.  Dr. Reik refers to a depression which "was largely a reaction to fears on his part that he was undergoing changes in his Parkinson's disease that would soon result in his being disabled."

On 1/18/99 there is a note by Dr. Cappadona referring to sleep difficulty and missing work due to fatigue.  The rest of the note is illegible.

*Robert Hartranft - Page 2*

On 2/1/99 there is a follow-up note to Dr. Cappadona stating that Mr. Hartranft would be "losing his job soon." The note goes onto state that Dr. Cappadona was prescribing Prozac for CFS (chronic fatigue syndrome). Notes from February of 1999 to October of 1999 are reviewed and largely refer to acute issues unrelated to CFS or fatigue.

In September of 1999 Mr. Hartranft sustained a fall resulting in the fracture of his low back. The fall occurred while he was operating a chain saw, having climbed a tree, to cut branches.

A note to Dr. Cappadona dated 3/18/99 from a Dr. Bozzuto, a psychiatrist, refers to a diagnosis of major depression with a history of dysthymia for 3-4 years with excessive sleeping, decreased energy and difficulty concentrating. A past history diagnosis of Lyme disease and a diagnosis of chronic fatigue was noted. He was stated to be improving on antidepressant medication.

He was seen in April of 2000 by Dr. Reik, the neurologist, for an annual follow-up. References to his depression and chronic fatigue syndrome and job loss was noted and that he was "immobilized by fatigue and depression and only recently has come out of this." Reference to the fall out of a pine tree "while trying to remove dead limbs with a chain saw" in September of 1999 was made. He was described as "awake, alert and oriented with normal speech and mentation." In July of 2000 he was evaluated by Dr. Reik for a peroneal neuropathy.

Records of Dr. Cappadona from January through August of 2000 area reviewed. These are largely illegible and do not indicate any significant impairment that can be discerned from the legible parts of the notes. There are references to low back pain and other acute symptoms. On 12/12/00 Dr. Cappadona notes that "energy better" but that "still unable to pursue employment."

In summary, Mr. Hartranft is a 58-year-old male with a history of Parkinson's disease, history of chronic dysthymia and difficulty sleeping with decreased energy level and difficulty concentrating (according to Dr. Bozzuto's note of 3/18/99) with the diagnosis by Dr. Cappadona of chronic fatigue syndrome made around February of 1999. There are other associated diagnoses including low back pain secondary to a vertebral fracture suffered in September of 1999. This report will address the issues other than Parkinson's disease, low back pain and depression.

*Robert Hartranft - Page 3*

The chronic fatigue syndrome is a constellation of symptoms with associated severe disabling fatigue. A working group of the Center for Disease Control defined a case of the chronic fatigue syndrome as including a number of symptoms and excluding certain medical and psychiatric diagnoses. The medical symptoms included to qualify as a defined case of chronic fatigue syndrome included: Self-reported impairment in concentration and short term memory, sleep disturbance, pervasive fatigue reducing an individual's capability to perform, a host of musculoskeletal symptoms. The diagnosis of chronic fatigue should not be made in the presence of an active medical condition which could explain the presence of chronic fatigue including untreated ones such as hypothyroidism, sleep apnea. A history of a major depressive disorder with psychotic or melancholic features, past or current, would also exclude the diagnosis of chronic fatigue syndrome.

**DISCUSSION:** From an internal medicine point of view, Mr. Hartranft's clinical symptoms as described by Drs. Cappadona and Bozzuto do not meet the definition of the chronic fatigue syndrome. Mr. Hartranft had two likely excluding diagnoses; major depression and Parkinson's disease to explain his self-reported symptoms of decreased energy, difficulty concentrating and difficulty sleeping and fatigue. These self-reported symptoms are common in individuals who suffer from depression.

The records of Dr. Cappadona do not support the diagnosis of chronic fatigue syndrome, but rather support Dr. Bozzuto's assertion of chronic depressive symptoms over a period of some time and treatment with an antidepressant around February of 1999.

The restrictions and limitations which may have been due to Parkinson's disease will be dealt with under a separate report.

A Psychiatric evaluation of Mr. Hartranft's symptoms and restrictions and limitations would be advisable. From an Internal Medicine point of view, the records do not support the diagnosis of chronic fatigue syndrome nor any restrictions or limitations due to this diagnosis.

**DISCUSSION WITH ATTENDING PHYSICIAN:** I reached Dr. John T. Cappadona, Mr. Hartranft's treating family physician on 7/16/01. In our conversation Dr. Cappadona made the following points.

*Robert Hartranft - Page 4*

1.) Mr. Hartranft's restrictions and limitations were due to combination of symptoms secondary to Parkinson's disease and medications related to it as well as depression.

2.) The diagnosis of chronic fatigue syndrome was made around February of 1999, but Dr. Cappadona acknowledges that it is difficult to make this diagnosis by standard criteria given the preexisting condition of Parkinsonism.

3.) At the present time Mr. Hartranft's Parkinson's disease has progressed to the point where he uses a cane and has a more significant tremor.

Mark Friedman, M.D.
(Internal Medicine)

*Robert Hartranft - Page 5*

## NEUROLOGIC REVIEW

Mr. Robert Hartranft is a 57-year-old male employed as a principal engineer at HSV Group, Inc. He last worked on 2/16/99. These records are being reviewed to determine functional capabilities as of that date. Mr. Hartranft's diagnoses include Parkinson's disease, chronic fatigue syndrome and depression. He subsequently developed a lumbar compression fracture in September of 1999 following a fall and a right L5 radiculopathy.

**HISTORY OF PRESENT ILLNESS:** Primary care records of Dr. Cappadona are reviewed in detail. An evaluation of 10/27/97 noted complaints of difficulty sleeping, headaches and exhaustion. Five days previously he had fallen onto a sidewalk, striking the front of his head. Difficulties with emotional adjustment are also outlined.

On 10/18/98 he complained of acute low back pain with an assessment of diffuse sprain of the lumbosacral spinal region. Difficulties with Parkinson's disease were also documented.

On 1/18/99, it was noted that he missed work for part of the month due to fatigue. Neurologically he was described as looking well with a normal gait and tone with a brief tremor.

On 2/1/99 Dr. Cappadona noted that Mr. Hartranft was losing his job soon. He complained of prolonged fatigue and Prozac was initiated for chronic fatigue syndrome. Difficulties with ongoing fatigue were documented and on 5/17/99 it was noted that he had a consulting job, but was unable to work at all. A note of 12/23/99 documented he fell out of a tree on 9/13/99, fracturing his L1 vertebral body. He started to look for work again and was fully independent. His chronic fatigue syndrome was described as being under control.

On 4/10/00 he was doing much better in terms of energy and spirit and was looking for work again. The Parkinson's disease was described as being stable. Low back pain was problematic as documented on 5/10/00. He was being treated with Trazodone. A worsening of gait was noted on 6/12/00 and Mr. Hartranft was using a walking stick. He was sleeping 12 hours per day and Pamelor was initiated.

*Robert Hartranft - Page 6*

On 8/13/00 the low back pain was described as being much better. His energy was also much better for the past few weeks.

On 11/17/00 his Parkinson's symptoms were described as "not bad." He was having marked fatigue for the past one month. He was unable to pursue employment.

A letter from Dr. Cappadona of 4/10/00 noted that Parkinson's disease was diagnosed in September of 1993. During 1999 Mr. Hartranft experienced excessive tiredness, tremor, muscular rigidity, pain, depression, poor balance and sleep irregularity. Chronic fatigue syndrome as first reported in September of 1998 and was treated with NADH. Throughout 1999, Mr. Hartranft was treated with Prozac for depression. A severely fractured L1 vertebrae due to the 9/13/99 fall was noted as well as a right rib fracture. Mr. Hartranft also was diagnosed with a concussion which prevented memory retention for three days. Dr. Cappadona indicated by September of 1998, Mr. Hartranft was no longer able to perform even 40 hours of productive work per week with declining productivity. He opined that Mr. Hartranft was fully and permanently disabled during 1999.

Emergency Room records of 10/22/98 indicated that Mr. Hartranft fell stepping off a curb and landing on his forehead and knees, sustaining a knee abrasion.

Psychiatric records of James Bozzuto, M.D. of 3/18/99 indicated 3-4 years of dysthymia which had become significantly worse over the previous two months with a diagnosis of major depression. Treatment with anti-depressants was begun one month previously and Mr. Hartranft was described as beginning to experience significant improvement.

A series of records from John Mara, M.D. in 1999 describe surgical treatment of a Dupuytren's contracture of the right fifth finger.

Orthopedic records of Stephan Lang, M.D. from October, 1999 describe treatment of the L1 compression fracture with a TLSO brace. By 12/29/99 it was noted he was doing well with some episodes of chronic low back pain.

Neurologic records of Lois Reik, Jr., M.D. of 12/9/98 indicate an increase in tremor and difficulty in balance related to Parkinson's disease as well as difficulty falling asleep and early morning awakenings. He was becoming so exhausted that Mr. Hartranft was

*Robert Hartranft - Page 7*

sleeping 14 hours a day for 3-4 days at a time. Examination indicated that Mr. Hartranft was able to get out of chair without using his hands on the first attempt and had a normal stride, but associated movements of the hands were diminished with a stooped posture. There was increased tone at the wrists. There is no retropulsion, anteropulsion or lateropulsion. It was opined that the Parkinson's disease was "a little worse" and Sinemet CR 50/200 was increased to three per day. Significant improvement was noted on 1/6/99 in energy and outlook. A half a plain Sinemet tab was added in the morning. Improvement of depression was opined.

On 4/21/00 it was noted that Mr. Hartranft had not been seen for about one year during which time he had been very depressed and had chronic fatigue syndrome. Examination shows normal speech and mentation. He could get out of a chair without using his hands. His stride was normal, but his stance was stooped. There were full associated arm movements in walking with only a modest increase of tone and no postural instability. It was felt he was doing acceptably in terms of Parkinson's disease. Trazodone was added for sleep.

Right leg weakness was documented on 7/5/00 with an EMG showing evidence of a right L5 radiculopathy. A lumbosacral MRI scan showed considerable central spinal stenosis at L1-2 with a 3 mm prolapse of a collapsed vertebral body, congenitally short pedicles and degenerative changes. There was pronounced narrowing of the L2-3, right L4-5 and bilateral L5-S1 neural foramen. A barium swallow of 5/1/00 was normal.

Follow-up by Dr. Reik on 7/12/00 noted substantial more weakness of peroneal muscles being barely 3/5. Evaluation by Hilary Onyiuke, M.D., Neurosurgery in July of 2000 indicated a disc herniation at L5-S1 with a grade I spondylolisthesis and surgical discectomy and surgery was recommended.

Follow-up by Dr. Reik on 8/30/00 noted that Mr. Hartranft had chosen to try a course of physical therapy with some improvement.

Medical records of David Kruger, M.D., Orthopedics, noted continued improvement through January of 2000. By 5/9/00 it was noted most of his problems were related to his Parkinson's disease. Attending Physician Statements from Dr. Cappadano are provided and reviewed. Multiple affidavits are provided and reviewed as well as a letter from attorney Judith Meyer of 4/7/01. A job description of principal engineer is reviewed.

*Robert Hartranft - Page 8*

**ATTEMPTS TO REACH ATTENDING PHYSICIAN:** I was able to speak with Dr. Reik on 7/6/01. A summary of this conversation is included in the attached letter.

**DIAGNOSES & DISCUSSION:**
1.) Parkinson's disease.
2.) L1 vertebral compression fracture; L5 radiculopathy.
3.) History of chronic fatigue syndrome.
4.) History of depression.

Based upon the medical records provided, Mr. Hartranft suffered from Parkinson's disease since 1993. Although the records document some progression particularly throughout 1999 and 2000, the degree of Parkinsonian symptoms remained mild to moderate. Of note, the examination of 12/9/98 indicated that he could get out of a chair without using his arms and that his stride was normal with no postural instability. There was an increase of tone at risk bilaterally and a somewhat stooped posture. With a modest increase of medication, he was substantially improved in energy and outlook by 1/6/99. There were no neurologic encounters at all between 1/6/99 and 4/21/00.

On 4/21/00 it was noted he was doing acceptably in terms of his Parkinson's disease. Because of the Parkinson's disease, Mr. Hartranft had work limitations/restrictions as of February of 1999 and onward. He should not work at heights where loss of balance would be danger to himself or others. He should not be required to walk more than one hour with an opportunity to rest. Fine coordinated hand movements should not be required.

Mr. Hartranft sustained an L1 vertebral body compression fracture on 9/13/99 related to falling out of a tree when he was trimming limbs from the tree. This compression fracture resulted in significant low back pain which substantially improved over a period of months. He subsequently developed an L5 radiculopathy related to degenerative changes of the lumbar spine. Although there are reports of intermittent low back pain prior to this fall, continuous ongoing problems with a lumbosacral syndrome are not documented prior to the fall. Additional work restrictions related to his lumbosacral degenerative disease prior to this fall are not substantiated.

Following the fall (after 9/13/99), because of the compression fracture and subsequent radiculopathy, he should not lift weights greater than 10 lb and repetitive or sustained lumbosacral motion should not be required. He should not be required to walk more than 30 minutes with an opportunity to rest and be allowed to change from the sitting to standing position ad lib.

Mr. Hartranft was diagnosed with chronic fatigue syndrome and major depression. These will be addressed in the accompanying review performed by Dr. Mark Friedman.


Brian Mercer, M.D.
(Neurology)


(hartranf.h15)



# UNIVERSITY DISABILITY CONSORTIUM
### *Physician Specialists for Disability Evaluation and Management*

July 6, 2001

Louis Reik, Jr., M.D.
University of Connecticut Medical Group
263 Farmington Avenue
Farmington, CT 06030

**Re: *Robert Hartranft***
      ***SS# 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***

Dear Dr. Reik:

Thank you for speaking with me today regarding the long disability application of Mr. Robert Hartranft through Hartford Insurance. The following is a summary of our conversation. If it is inaccurate in any way, please contact me within 15 working days.

You communicated that you were treating Mr. Hartranft for Parkinson's disease in December of 1998 and January of 1999. At that time you indicated that the motor aspects of the Parkinson's disease were mild and you thought that he could by employed in a light duty capacity on a full time basis solely from the perspective of his Parkinson's disease. You also noted that he had difficulties with depression and chronic fatigue syndrome. You noted that at one point his depression became quite severe, although you were not treating him for this and you were uncertain when that occurred. You indicated that any work restrictions or limitations related to his depression or chronic fatigue syndrome would be deferred to his treating psychiatrist and primary care physician.

Thank you for speaking with me today.

Brian Mercer, M.D.

*(hartran2)*

# UNIVERSITY DISABILITY CONSORTIUM

*Physician Specialists for Disability Evaluation and Management*

July 16, 2001

John D. Cappadona, M.D.
720 Hopmeadow Road
Simsbury, CT 06070

**Re: Robert Hartranft**
    **SS# 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**

Dear Dr. Cappadona:

Thank you for taking the time to speak with me today regarding your patient's disability status. To summarize our conversation;

1. Mr. Hartranft had symptoms of Parkinson's disease and depression and possibly side effects of medications around February of 1999.
2. It is difficult to separate out his symptoms with regard to these diagnoses and in your opinion, there is an overlap between the physical and emotional diagnoses and Mr. Hartranft's status in February of 1999.
3. While the diagnosis of chronic fatigue syndrome appears in the records around early 1999, the criteria for this diagnosis generally excludes significant preexisting medical illnesses such as Parkinson's disease.
4. It is your opinion as well as his neurologist that his restrictions and limitations are primarily due to Parkinson's disease and that this has progressed to the point where he now uses a cane and has a more severe tremor.

Thank you for taking the time to discuss your patient with me.

Very truly yours,

Mark Friedman, M.D.

*(hartran3.h15)*

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

ROBERT M. HARTRANFT, JR.                    :

     Plaintiff   :    CIVIL ACTION NO.
             :    3:01CV1870 (GLG)

v.            :

HARTFORD LIFE & ACCIDENT  :    NOVEMBER 27, 2002
INSURANCE COMPANY, ET AL

     Defendants  :
             :

**OBJECTIONS AND RESPONSES TO
PLAINTIFF'S SEPTEMBER 25, 2002 FIRST SET
OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO
DEFENDANT HARTFORD LIFE & ACCIDENT INSURANCE COMPANY**

DEFINITIONS

Plaintiff hereby incorporates by this reference each and every definition included in

District of Connecticut Local Rule 39 and Rule 34(a), Fed.R.Civ.P.  In addition, these

Requests are subject to the following definitions in accord with Local Rule 39(a).

  1.  "You", "your" and "yourself" refers to Hartford Life and Accident Insurance

Co., and each of its employees, agents, representatives, officers, directors, affiliates,

predecessor and successor agencies or entities, divisions, area and regional offices.

3.    Please state the number of claims that the University Disability Consortium

reviewed for you in 2000.

**OBJECTION:**    Hartford Life objects to this request because the term "claims" is vague and undefined and therefore is overbroad and burdensome (e.g., short term disability claims are not at issue in this lawsuit). Further, Hartford Life objects to this request as irrelevant and immaterial insofar as it seeks disclosure of information about medical records reviews other than that review involving plaintiff's claim for long-term disability benefits. Finally, Hartford Life objects to this request as it is overbroad and burdensome because it would require a tedious, time consuming and expensive process, which is not reasonably calculated to lead to the discovery of evidence admissible at trial.

**RESPONSE:**    Notwithstanding and without waiving its Objections, UDC did not perform any medical records reviews for Hartford Life in 2000.

4.    Please state the number of claims that the University Disability Consortium

reviewed for you in 2001.

**OBJECTION:**    See Objection to Request No. 3. Further, Hartford Life objects to this request as irrelevant and immaterial insofar as it seeks information about medical records reviews performed by UDC after July 16, 2001, the date UDC issued its Records Review Report regarding the plaintiff's claim. Any request for information after that date is not reasonably circumscribed in time and is not reasonably calculated to lead to the discovery of evidence admissible at trial.

**RESPONSE:**    Notwithstanding and without waiving its Objections, based on readily available information, it appears that UDC provided medical records review services for Hartford Life in connection with approximately 30 claims referred to it between May 9, 2001 and July 16, 2001.

8

5.    Please state the number of claims that the University Disability Consortium reviewed for you between January 1, 2002 through June 30, 2002.

**OBJECTION:**    **See Objection to Request No. 4.**

6.    Please state the total fee paid by you to the University Disability Consortium for its review of plaintiff's claim.

**OBJECTION:**    **Hartford Life objects to this request as irrelevant and immaterial inasmuch as it is not reasonably calculated to lead to the discovery of evidence admissible at trial.**

**RESPONSE:**    **Notwithstanding and without waiving its Objections, Hartford Life paid UDC $1,150.00 for the services it rendered in connection with the plaintiff's claim for long-term disability benefits.**

7.    Please state the total fees paid by you to the University Disability Consortium in 2000.

**OBJECTION:**    **Hartford Life objects to this request as irrelevant, immaterial and overbroad as it improperly seeks information regarding fees paid by Hartford Life to UDC for services other than the review of medical records in connection with the plaintiff's claim for long-term disability benefits or claims for long-term disability benefits of the kind at issue in this lawsuit.  Further, Hartford Life objects to this request because it is not reasonably calculated to lead to the discovery of evidence admissible at trial.**

**RESPONSE:**    **Notwithstanding and without waiving its Objections, Hartford Life did not pay fees to UDC for any medical record reviews in 2000.**

8.    Please state the total fees paid by you to the University Disability Consortium in 2001.

9

**OBJECTION:**      See Objection to Request No. 7.   Further, Hartford Life objects to this request as irrelevant and immaterial insofar as it seeks information regarding fees paid to UDC after July 16, 2001, the date UDC issued its Records Review Report regarding the plaintiff's claim.  Any request for information after that date is not reasonably circumscribed in time and is not reasonably calculated to lead to the discovery of evidence admissible at trial.

**RESPONSE:**      Notwithstanding and without waiving its Objections, based on readily available information, Hartford Life paid UDC approximately $23,270.00 for all services provided by UDC in connection with medical records referred to UDC between May 9, 2001 and July 16, 2001.

9.    Please state the total fees paid by you to the University Disability Consortium between January 1, 2002 through June 30, 2002.

**OBJECTION:**      See Objection to Request No. 8.

10.    Please state the number of claims reviewed by the University Disability Consortium for any other entity in 2000.

**OBJECTION:**      Hartford Life objects to this request as irrelevant, immaterial, overbroad and not reasonably calculated to lead to the discovery of evidence admissible at trial.  Further, Hartford Life objects because it is under no obligation to gather any information from a third party on behalf of the plaintiff and this request is unduly burdensome.

11.    Please state the number of claims reviewed by the University Disability Consortium for any other entity in 2001.

**OBJECTION:**      See Objection to Request No. 10.

12.    Please state the number of claims reviewed by the University Disability Consortium for any other entity between January 1, 2002 through June 30, 2002.