1

```
1              UNITED STATES DISTRICT COURT

2                 DISTRICT OF CONNECTICUT

3   ROBERT M. HARTRANFT, JR.,       DOCKET NO. 3:01CV1870(GLG)

4            PLAINTIFF,

5   VS

6   HARTFORD LIFE AND ACCIDENT      September 30, 2003

7   INSURANCE CO.,

8            DEFENDANT.

9

10              DEPOSITION OF JODI L. LUSSIER

11

12  APPEARANCES:

13          LAW OFFICES OF JUDITH D. MEYER, ESQ.
                Attorney for the Plaintiff
14              152 Simsbury Road
                Post Office Box 451
15              Avon, Connecticut 06001-0451
            BY:  JUDITH D. MEYER, ESQ.
16
            DELANEY, ZEMETIS, DONAHUE, DURHAM & NOONAN, PC
17              Attorneys for the Defendant
                741 Boston Post Road, Suite 306
18              Guilford, Connecticut 06437
            BY:  MICHAEL G. DURHAM, ESQ.
19
            DAY, BERRY & HOWARD, LLP
20              Attorneys for HSB Group, Inc.
                CityPlace I
21              Hartford, Connecticut 06103-3499
            BY:  ERIC L. SUSSMAN, ESQ.
22
             Also present:  Merily Tine
23

24

25                  DONALD E. HUBBARD, LSR #00007
                    REGISTERED PROFESSIONAL REPORTER
```

7

1        Q    Thank you.   You were formerly employed by

2    Hartford Steam Boiler?

3        A    Yes.

4        Q    When you were an employee, what position did

5    you hold?

6        A    My most recent position was assistant vice

7    president of benefits administration.

8        Q    And when did you assume the position of

9    assistant vice president?

10        A    Best of my recollection, I believe it was June

11    of 2000.

12        Q    What was your position before that time?

13        A    Director of benefits administration.

14    Basically a title change.   It was essentially the same

15    position.

16        Q    Who did you report to?

17        A    Susan Ahrens was the vice president of human

18    resources.

19        Q    Was there someone you reported to who was

20    responsible for benefits administration at Hartford Steam

21    Boiler?

22        A    Sue had overall responsibility for human

23    resources which encompassed benefits administration.

24        Q    But you were the highest person who dedicated

25    your time to benefits administration?

10

1    Master's of Science degree with a concentration in human

2    resources management and a professional designation in

3    benefits administration.

4            Q    Where did you obtain your Master's degree?

5            A    Rensselaer Polytechnic Institute, Rensselaer

6    in Hartford.

7            Q    When did you get your Master's degree?

8            A    I completed it in 1992.

9            Q    Where were you employed when you completed

10    your Master's degree?

11            A    Hartford Steam Boiler.

12            Q    For how long were you employed there?

13            A    Just over 14 years.

14            Q    And you commenced your employment with

15    Hartford Steam Boiler when?

16            A    1988 March.

17            Q    All right.   You worked there until 2002?

18            A    May of two -- no, May of -- was it 2002?   Yes,

19    May of 2002.

20            Q    Why did you leave Hartford Steam Boiler?

21            A    My job had changed as a result of our

22    acquisition by American International Group and I just

23    wasn't pleased with it anymore.

24            Q    In what way did your job change?

25            A    Most of the responsibility and authority that

11

1    I previously had was assumed by the parent, the new

2    parent company.

3         Q    And did you then go to work for the Smith

4    Agency?

5         A    Not immediately, no.  I took three months off.

6         Q    I see.  When you first became employed at

7    Hartford Steam Boiler, by which I mean to include HSB

8    Group, Inc. and whatever the company has been known as

9    otherwise for purposes of this deposition, when you first

10   went to work there did Hartford Steam Boiler offer long

11   term disability benefits to its employees?

12        A    Yes.

13        Q    Do you know why Hartford Steam Boiler offered

14   that benefit to its employees?

15        A    I would say that it was because they thought

16   it was an important benefit for employees to have.

17        Q    Did anyone at Hartford Steam Boiler ever

18   discuss with you why there was a policy to provide that

19   benefit?

20        A    Not specifically, no.

21             MS. MEYER:   Would you please mark this.

22             (Plaintiff's Exhibit 1 marked for

23   identification and described in the index.)

24   BY MS. MEYER:

25        Q    Showing you what's been marked Exhibit 1 for

12

1    purposes of this deposition.  Do you recognize that

2    document?

3          A    Yes.

4          Q    Ms. Lussier, for the record, I'm just going to

5    point out that this is an eight-page document, and if I

6    show you a document that's multiple pages, you're

7    entitled to look at it carefully.  I'm just noting for

8    the record that you had only looked at the first page

9    before you answered my question, and I want to make sure

10   that you are carefully answering my question about what

11   the document is.

12         A    Yes, I recognize this document.

13         Q    What is it?

14         A    It's a section of Hartford Steam Boiler's

15   consolidated summary about a plan description called

16   "Making Tracks."  This is the disability section.

17         Q    On the first page at the bottom right I

18   noticed a notation that says 1/99.  Do you know what that

19   means?

20         A    That's the date of the most recent revision to

21   the section 1/99.

22         Q    Was that true through the end of your

23   employment at Hartford Steam Boiler?

24                    MR. SUSSMAN:   Objection to the form of

25   the question.

13

1       A    I'm sorry, can you repeat the question.

2   BY MS. MEYER:

3       Q    Was that through the end of your employment at

4   Hartford Steam Boiler?

5       A    Was what true, that this date would represent

6   the most recent revision?

7       Q    Yes.

8       A    It's my understanding that's the case, yes.

9       Q    Who wrote this document?

10      A    The original drafting of this document I think

11  even predates my employment at HSB.  The revisions, while

12  I was employed there, were made by the person who was

13  responsible for employee communications.  We had a person

14  in the human resources department who had responsibility

15  for employee communications, and that would have been her

16  responsibility.

17      Q    Who was that, if you know, in 1999?

18      A    In '99 it would have been Ann Waller.

19      Q    What was the purpose of this booklet?

20      A    It had multiple purposes.  It served as an

21  employee handbook for purposes of general policies, and

22  it also served as summary plan description for the

23  benefit plans.

24      Q    I understand from this document that there was

25  a disability income plan, correct?

15

1        A    It's not incorrect.   It's just not complete.

2    There is a more complete definition of disability in the

3    plan document.

4        Q    All right.   Do you know who the plan

5    administrator was under the disability plan that's

6    described in this summary plan description?

7        A    Again, I believe that is stated in the plan

8    document.  My recollection is that it was Hartford -- the

9    plan administrator was the disability committee for The

10   Hartford Steam Boiler.   But it is stated in the right

11   side as a section of the plan.

12       Q    Fair enough.   And this summary plan

13   description describes two different benefits, correct?

14       A    Yes.

15       Q    One of them is short term disability and the

16   other is long term disability, correct?

17       A    Correct.

18       Q    Those are usually referred to as STD and LTD

19   respectively, correct?

20       A    Yes.

21       Q    Under the STD benefit, what is the definition

22   of disability?

23       A    I would need to see a copy of the plan to tell

24   you the definition of disability.   I don't have it

25   memorized.

17

1       Q    And in this document, how is the term "totally

2    disabled" defined for purposes of the long term

3    disability benefit?

4       A    Well, I sound like a broken record, but I am

5    going to repeat myself.  It is not completely and

6    extremely clearly defined.  However, this document says

7    the long term disability plan assures you of a regular

8    plan if you have a long term injury or illness.  The plan

9    has a more complete definition of long term disability.

10       Q    Are you referring to page 04 at this time?

11       A    Yes.

12       Q    And there is an indication that if you cannot

13    perform the duties of your own occupation because of

14    illness or after two years any occupation, that the plan

15    will pay benefits?

16       A    Yes.  Under the LTD portion you will be

17    considered totally disabled during the first 24 months if

18    you can't perform your own occupation, and the next two

19    years after the same illness if you cannot work at any

20    gainful employment, you are considered long term

21    disabled.

22       Q    In this summary plan description, is there any

23    indication how an employee should make a claim for long

24    term disability?

25       A    Page 06 has a very brief paragraph in the

18

1    upper left about applying for LTD benefits but, once

2    again, it's further expanded in the plan documents.

3          Q    While you were employed at Hartford Steam

4    Boiler, an employee could apply for additional long term

5    disability coverage, correct?

6          A    Yes.

7          Q    The employer paid for coverage that would have

8    a benefit of 60 percent of monthly salary, correct?

9          A    Correct.

10         Q    And the employee could apply to increase his

11   or her coverage to 70 percent of monthly salary, correct?

12         A    Correct.

13         Q    And, in fact, Mr. Hartranft did apply for the

14   increased benefit, didn't he?

15         A    To be honest, I'm not sure if he did or not.

16                MS. MEYER:   Would you mark this, please.

17                (Plaintiff's Exhibit 2 marked for

18   identification and described in the index.)

19   BY MS. MEYER:

20         Q    Showing you what's been marked Exhibit 2, a

21   single page document.

22         A    This document looks like a copy of a paycheck,

23   yes.

24         Q    It's a Hartford Steam Boiler paycheck,

25   correct?

19

1      A    Yes.

2      Q    It's Robert Hartranft's paycheck, correct?

3      A    Yes.

4      Q    It's a pay stub, isn't it?

5      A    Yes, it's a check invoice.

6      Q    And it indicates payroll deductions?

7      A    Yes.

8      Q    Does it indicate a payroll deduction for

9  increased long term disability benefits?

10      A    Yes.

11      Q    Does that help refresh your recollection about

12  whether Mr. Hartranft did in fact apply for and pay for

13  additional coverage under the long term disability

14  policy?

15      A    Yes, based on this document, he was paying for

16  additional LTD coverage.

17      Q    How did he pay for the additional LTD

18  coverage?

19              MR. SUSSMAN:  Objection to the form.

20      A    I don't think I understand your question.

21  BY MS. MEYER:

22      Q    Fair enough.  What was the mechanism by which

23  Mr. Hartranft paid for the increased coverage for long

24  term disability benefits?

25              MR. SUSSMAN:  Objection to the form of

20

1    the question.

2        A    Based solely on this document, I would have to

3    say it was being deducted from his paycheck.

4    BY MS. MEYER:

5        Q    So, it's fair to say that he paid for this

6    insurance through Hartford Steam Boiler, correct?

7        A    Yes.

8        Q    And that Hartford Steam Boiler deducted the

9    premiums from each paycheck, correct?

10       A    Correct.

11       Q    Returning your attention to Exhibit 1 for a

12   minute.   The summary plan description, and in particular

13   to page 07, were there any benefits in addition to

14   insurance coverage for salary replacement that were

15   offered to Hartford Steam Boiler employees who had a long

16   term disability?

17       A    I'm sorry, can you repeat that?   Were there

18   any benefits?

19       Q    In addition to the insurance coverage for

20   monthly salary that was offered to employees of Hartford

21   Steam Boiler, who had long term disability?

22       A    I'm going to repeat that back to you to make

23   sure I understood it.   Are you saying were there any

24   other income replacement benefits other than long term

25   disability offered HSB employees?

22

1          A    It means that even though they were off the

2    Hartford Steam Boiler payroll as a result of their long

3    term disability, the pension plan continued to count

4    years of service for purposes of their pension

5    calculation at the point in time at which they were

6    eligible to retire.

7          Q    All right.

8                    (Plaintiff's Exhibit 3 marked for

9    identification and described in the index.)

10   BY MS. MEYER:

11         Q    Showing you what's been marked Exhibit 3 to

12   this deposition.  For the record, that's a document

13   that's Bates stamped HSB0125 through HSB0131.  Do you

14   recognize that document?  You know something, I made a

15   mistake and gave you one that has all sorts of marks on

16   it.  I'm going to take that back and have the court

17   reporter re-mark this one.

18         A    Okay.

19                    (Plaintiff's Exhibit 3 re-marked for

20   identification and described in the index.)

21         A    Yes, I recognize that document.

22   BY MS. MEYER:

23         Q    What is it?

24         A    It represents a portion of the plan document

25   for HSB's disability plan.

23

1        Q    This is only a portion of the document?

2        A    There is another document that is incorporated

3    into this by reference.   That would be the long term

4    disability policy.

5        Q    All right.   Was this document disseminated to

6    all Hartford Steam Boiler employees at any time?

7        A    No.

8        Q    There is a statement on it that it's, "Amended

9    and restated as of January 1, 1998."   Can you explain

10    that?

11        A    Effective January 1st, 1998, HSB changed the

12    funding arrangement for its long term disability program

13    with The Hartford.   It converted from a self-insured plan

14    to a fully insured plan.   So, on that date we

15    incorporated the policy that we had in place with The

16    Hartford by reference to this document (indicating).   So,

17    that was the amendment and restatement.   That was the

18    purpose for the amendment and restated on that date.

19    That was the effective date of our change with The

20    Hartford.

21        Q    Who wrote the amendments?

22        A    They were --

23             MR. DURHAM:   To Exhibit 3?

24    BY MS. MEYER:

25        Q    The amendments -- yes, it says, "Amended and

24

1    restated as of January 1, 1998."  That's what I'm

2    referring to, yes.

3          A    The amendments were -- primarily the changes

4    to the plan were incorporated into the document that was

5    attached to this, which was the policy written by The

6    Hartford.  And other than that, changes to the document

7    were drafted by an attorney in HSB's law department.

8          Q    Do you know what attorney?

9          A    Her name is Jean Cohn.

10          Q    Within this document, is there a definition of

11    disability?

12          A    Yes.

13          Q    And what's the definition of disability?

14          A    If you refer to Section 1.3 in definitions on

15    page -- well, I guess the way it's referenced here is

16    126.

17          Q    HSB0126?

18          A    HSB0126.  "Accidental bodily injury; sickness;

19    mental illness; substance abuse; or pregnancy," et

20    cetera, if you don't mind not reading the rest, but

21    "prevent from performing the essential duties of his or

22    her occupation."

23              That's one definition.  There are other

24    references, I believe.  If you can give me a minute to

25    look through this.  Section 1.10 on HSB0127 indicates,

25

1     "The definition of a period of disability means one day

2     or a number of days an employee is scheduled to work but

3     does not actually work due to disability."

4           And in the absence of the remainder of this

5     document, that's the extent of the definition, I believe,

6     based on what I'm looking at here.

7           Q    The remainder of this document meaning The

8     Hartford Life policy?

9           A    Yes.

10          Q    All right.

11               MR. SUSSMAN:   Object to the form.

12    BY MS. MEYER:

13          Q    When I say Hartford Life --

14               MR. DURHAM:   Before you go on, can you

15    just read back what the witness answered.   I didn't hear

16    it.

17               (The record was read by the court

18    reporter.)

19               MR. DURHAM:   I'm confused because I

20    thought we were talking about Exhibit 3 and now we're

21    talking about the policy.   I object to the form of the

22    question.

23               MS. MEYER:   I'm going to go on because

24    we need to move ahead.

25    BY MS. MEYER:

26

1       Q    Can you explain to me the sentence in the

2   disability definition that follows what you have read

3   before on 0126, "The disability committee has sole

4   discretion to determine whether a particular situation is

5   intended to be covered by the plan."

6            Can you explain that to me?  What does that

7   mean?

8       A    The disability committee was the plan

9   administrator, so to the degree that an ERISA plan is

10  required to have a designated plan administrator, the

11  committee had responsibility for oversight of the entire

12  plan.  I believe that's what that's intended to convey.

13      Q    To determine whether a particular situation is

14  intended to be covered by the plan, what did that mean?

15            MR. SUSSMAN:  Objection to the form of

16  the question.

17      A    It's a very broad statement.  It could mean a

18  number of things.  It could mean, you know, is this a

19  disability situation or is this a Workers' Comp

20  situation, for example, you know.  It does not

21  necessarily mean -- it's not intended to mean that the

22  disability committee made every disability decision that

23  came to it.  It was intended to describe the disability

24  committee's broad responsibility for the disability plan.

25  That is my understanding of that sentence.

29

1         A    I was going to say which plan, which

2    application are we talking about?  Okay.  There were

3    several applications that he made.  There was one for

4    short term and one for long term.

5    BY MS. MEYER:

6         Q    My question was:  At some point in time Mr.

7    Hartranft applied for disability benefits, correct?

8                   MR. DURHAM:  Objection to the form.

9                   MR. SUSSMAN:  Objection to the form.

10        A    He applied for both short term disability

11   benefits and subsequently for long term disability

12   benefits.

13   BY MS. MEYER:

14        Q    Did he apply for disability benefits --

15                   MR. SUSSMAN:  Objection to the form of

16   the question.

17        A    He applied for both types of benefits.

18   BY MS. MEYER:

19        Q    Both types of disability benefits?

20        A    Correct.

21        Q    He applied for both simultaneously, didn't he?

22                   MR. SUSSMAN:  Object to the form.

23                   MR. DURHAM:  Objection.

24        A    No, he did not apply simultaneously.  He

25   applied for short term disability benefits and

30

1    subsequently long term disability benefits.

2    BY MS. MEYER:

3         Q    He asked you to provide him with some

4    documents, correct?

5                   MR. SUSSMAN:   Objection to the form of

6    the question.

7         A    At various points in time, yes, he requested

8    various documents.

9                   (Plaintiff's Exhibit 4 marked for

10   identification and described in the index.)

11   BY MS. MEYER:

12        Q    Showing you what's been marked Exhibit 4.   Do

13   you recognize that document?

14        A    Yes.

15        Q    What is it?

16        A    It is a request from Mr. Hartranft to provide

17   him with documentation regarding the long term disability

18   plan.

19        Q    What documents did he actually ask you for?

20   Was he more specific?

21        A    Excuse me?

22        Q    Was he more specific than that?

23        A    He asked for material necessary to apply for

24   long term disability benefits and he asked for a copy of

25   the policy, as well as any material to understand the

1   basis of a decision on whether such benefits would be

2   granted.

3        Q    Do you know who at Hartford Steam Boiler

4   responded to this request for documents?

5        A    I believe I did.

6        Q    What did you send him?

7        A    I recall sending him a copy of the long term

8   disability application, a copy of the long term

9   disability policy, as well as the plan document.

10        Q    What is the plan document that you referred

11   to?

12        A    The plan document is Exhibit 3.

13        Q    You believe you sent him Exhibit 3?

14        A    Yes.

15             (Plaintiff's Exhibit 5 marked for

16   identification and described in the index.)

17   BY MS. MEYER:

18        Q    Showing you what's been marked Exhibit 5.   Do

19   you recognize that document?

20        A    Yes.

21        Q    What is it?

22        A    It's a letter that Mr. Hartranft wrote to

23   Georgia Feigel.

24        Q    Who is Georgia Feigel?

25        A    Georgia Feigel at the time was -- she was

32

1    director in the human resources department.  She had

2    responsibility for compensation and the human resource

3    information system and he addressed the letter to her

4    instead of me and in this letter he is requesting to

5    submit a claim under the disability plan.

6            Q    Is it exclusively for short term disability or

7    long term disability?

8                    MR. DURHAM:  Objection to form.

9                    MR. SUSSMAN:  Objection to the form of

10   the question.

11   BY MS. MEYER:

12           Q    You can answer the question.

13           A    I'm reading.  If I can just have one minute.

14   His first sentence says he's submitted a claim under my

15   HSB disability insurance policy.  And in the third

16   paragraph he indicates that in accordance with the

17   version of Making Tracks, this claim involves an initial

18   claim for short term followed by an ongoing claim for

19   long term.

20           Q    So, is it fair to say that he applied for both

21   simultaneously?

22                   MR. SUSSMAN:  Objection to the form of

23   the question.

24   BY MS. MEYER:

25           Q    You can answer the question.

33

1      A    There is a separate process for applying for

2    long term disability.  That was not included with this

3    letter.  So our characterization of the letter is his

4    application for short term disability benefits.

5      Q    You interpreted this letter to be an

6    application only for short term disability benefits; is

7    that correct?

8      A    It was not an interpretation.  It was merely

9    stating a fact that to apply for long term benefits a

10   separate set of forms needed to be completed that was not

11   included with this letter.

12     Q    Did you regularly disseminate copies of that

13   form to all employees of Hartford Steam Boiler?

14     A    No.

15     Q    Did the company regularly disseminate them?

16     A    No.

17            MR. DURHAM:    LTD forms?

18     A    Yes.

19   BY MS. MEYER:

20     Q    Under what circumstances did you provide an

21   employee with the appropriate form to apply for long term

22   disability benefits?

23     A    Upon their request, or nearing the end of

24   their short term disability if we were aware of it.

25     Q    So, as I understand it, you received Exhibit 5

34

1    from Ms. Feigel?

2         A    Yes.

3         Q    What did you do in response?

4         A    My recollection is that, and I may not have

5    this sequence entirely correct, but I would have had to

6    contact someone in the law department who was also on the

7    committee, and I believe I was advised to call a meeting

8    of the disability committee to discuss how we would

9    address his request.

10        Q    Did you call a meeting of the disability

11   committee?

12        A    Yes, there was a meeting.

13        Q    Do you recall who was on the committee at the

14   time?

15        A    At the time, yes.  Do you want names?

16        Q    Certainly, if you remember them.

17        A    I do.  It was myself, Kevin Price, Jean Cohn,

18   Bobbie O'Brien, Betty Kerber, Sue Ahrens and Jim Rowan.

19        Q    So there were six members of the committee?

20        A    Seven.

21        Q    Seven members of the committee.  Sorry.

22        A    That's okay.

23        Q    Didn't mean to leave you out.

24        A    That's okay.

25        Q    And the committee convened in response to Mr.

35

1    Hartranft's letter application within a short time

2    thereafter?

3         A    I honestly don't remember the time frame.  I

4    believe it was relatively quickly thereafter.

5         Q    With Mr. Hartranft's letter to Ms. Feigel, he

6    included a report from a physician, correct?

7         A    That's my recollection, yes.  I would need to

8    see it.

9                    (Plaintiff's Exhibit 6 marked for

10   identification and described in the index.)

11   BY MS. MEYER:

12        Q    Showing you what's been marked Exhibit 6.  Do

13   you recognize that document?

14        A    Yes.  I recognize this document.

15        Q    What is it?

16        A    It was a letter from Doctor Cappadonna that

17   accompanied Mr. Hartranft's letter of April 26th.

18        Q    And that's the physician's report that he

19   submitted with his application for disability benefits?

20                    MR. DURHAM:   Object to the form.

21                    MR. SUSSMAN:   Joined.

22        A    He submitted it with his request for

23   disability benefits, yes.

24   BY MS. MEYER:

25        Q    All right.  So, to be clear, Exhibit 6 was

36

1    sent to Hartford Steam Boiler with Exhibit 5, correct?

2          A    Correct.

3          Q    And you received the two of them together,

4    correct?

5          A    Correct.

6          Q    The committee met and did what?

7          A    Again, I'm trying to recall the sequence.  My

8    recollection is that the committee met, reviewed this

9    information and asked that I attempt to get information

10   on -- this was kind of a new avenue for us to go down in

11   terms of the committee reviewing a short term disability

12   claim.  So, they asked that I go out and get input from

13   people who had experience in the area of disability to

14   try to get input on how something like this would be

15   approached, and so I did that, and then the idea was we

16   would reconvene after I got that information and discuss

17   the claim further.

18         Q    You said this was a new route or a new road?

19   Could you just explain a little better what you mean by

20   that?

21         A    Short term disability claims didn't often come

22   to the committee for review.  This was unique because it

23   was so far ahead of when the claim actually occurred.

24   Generally short term disability claim is concurrent with

25   the disability.  So, to retrospectively review a short

37

1    term disability claim was something new for the

2    committee.

3        Q    In other words, the committee -- withdrawn.

4    I'm hoping this is going to be helpful to you.  I'm going

5    to have you mark three exhibits.

6                    (Plaintiff's Exhibits 7, 8 and 9 marked

7    for identification and described in the index.)

8    BY MS. MEYER:

9        Q    For the record, Exhibit 5 is two pages,

10   Exhibit 6 is three pages.

11               I'm going to show you Exhibit 7 which, for the

12   record, is three pages, and Exhibits 8 and 9, which are

13   each one page, and ask you to review them and tell me if

14   you recognize them.

15       A    Yes, I recognize these documents.

16       Q    Are Exhibits 7, 8 and 9 your handwritten

17   notes?

18       A    Yes.

19       Q    You wrote them?

20       A    Yes.

21       Q    All right.  Starting -- well, can you put them

22   in order chronologically?  And if you can't, that's all

23   right.

24       A    Unfortunately, I stopped writing the date on

25   Exhibit 9.  It just says 5.  So, that doesn't help me

44

1          Q    And he didn't work at Hartford Steam Boiler

2    anymore after he retired?

3          A    He worked on a contract basis, on an as-needed

4    basis.

5          Q    So did he continue to work with Mr. Hartranft?

6          A    I can't say for sure.

7          Q    You don't know.  You also spoke with Bernie

8    Selig about Mr. Hartranft, correct?

9          A    Yes.

10          Q    What did Bernie Selig tell you about Mr.

11    Hartranft?

12          A    You know, I didn't take notes on that meeting

13    for some reason.  I recall him telling me -- this was a

14    brief meeting.  I remember him sitting in my office for

15    about five or ten minutes, that they had been friends for

16    a long time, and this is really, really stretching here,

17    but I do know that he said they had been friends for a

18    long time, he was aware of Mr. Hartranft's diagnosis and

19    he was fairly certain that it was not well known.

20          Q    Bernie Selig was fairly certain that the

21    diagnosis was not well known?

22          A    Was not well known in general by other people

23    at Hartford Steam Boiler, and frankly with the absence of

24    notes, that's about all I can recall of that

25    conversation.  I do know it was brief.

45

1        Q    Did he give you any indication of what he

2    believed Mr. Hartranft's performance had been at the end

3    of his employment?

4        A    No.  Not that I recall, no.

5        Q    Or of his attendance, his reliability?

6        A    No.  Not that I know.

7        Q    Did you ask him?

8        A    I don't even know if I asked him.

9        Q    What questions did you ask?

10        A    I honestly don't remember.  As I said, it was

11    a very brief unscheduled meeting unlike these where I

12    specifically took notes and, you know, set up a meeting

13    and said, We are here to talk about Bob.  It was a very

14    informal, and as I said, unplanned discussion.

15        Q    Drawing your attention to Exhibit 8.  What's

16    "Jean/Sue meeting"?

17        A    Jean Cohn, as I mentioned earlier, was the

18    attorney in the law department who often assisted me on

19    benefit issues.  Sue Ahrens was my manager who was the

20    vice president of human resources, and the two of us

21    convened to discuss the next committee meeting and they

22    recommended that before the next committee meeting that I

23    get input from what they, I think, referred to as expert

24    sources, that is try to get some input from The Hartford

25    and try to get some input from John Small who was a

55

1        Q    Showing you Exhibit 12.   Do you recognize that

2   document?

3        A    Yes.

4        Q    What is it?

5        A    It was Mr. Hartranft's response to our denial

6   letter -- denial of his STD benefits.

7        Q    Did you treat this letter as an appeal of the

8   denial of the STD benefits?

9        A    Yes.

10       Q    And did you treat it as a request for further

11  documentation or information?

12       A    Yes.

13       Q    What further information did you provide, if

14  you know?

15       A    I don't specifically recall.   I recall

16  responding with an e-mail, which I couldn't tell you the

17  contents of because I don't have it in front of me, but I

18  know I responded to him in writing at least once.

19       Q    All right.   Showing you what's been marked

20  Exhibit 13.   Do you recognize that document?

21       A    Yes.

22       Q    What is it?

23       A    It's an e-mail to Bob sending -- indicating

24  that I had -- that I was about to send out the long term

25  disability application forms to him.