56

1       Q    It says the LTD forms and plan document,

2    correct?

3       A    Yes.

4       Q    That's a singular plan document, isn't it?

5              MR. SUSSMAN:    Objection to the form of

6    the question.

7       A    There is a plan document that encompasses both

8    short and long term disability.    That's the document that

9    I forwarded to him.

10   BY MS. MEYER:

11      Q    That's what you sent him?

12      A    Yes, in addition to the long term disability

13   application forms.

14      Q    Is what you sent him an exhibit so far in this

15   deposition, to your knowledge?

16      A    No.    The materials referenced in this e-mail

17   are not entirely -- they are not all represented by the

18   exhibits.    The long term disability forms are not

19   exhibits, nor is the entire plan document because the

20   plan document also includes the long term disability

21   policy which is not included in here.

22              MS. MEYER:    All right.

23              (Plaintiff's Exhibit 14 marked for

24   identification and described in the index.)

25   BY MS. MEYER:

57

1          Q    Showing you what's been marked Exhibit 14.   Do

2     you recognize that document?

3          A    Yes.

4          Q    What is it?

5          A    It is the long term disability policy between

6     HSB Group and The Hartford.

7                    MS. MEYER:    Would you read that back,

8     please?

9                         (The record was read by the court

10    reporter.)

11    BY MS. MEYER:

12         Q    Right now this is copied pages.   This is 29

13    pages plus the front and back of a booklet that was

14    originally bound, correct?

15         A    I believe so, yes.

16         Q    Looking at the last page it says, "The plan

17    described in this booklet is insured by Hartford Life and

18    Accident Insurance Company," correct?

19         A    Yes, that's what it says.

20         Q    All right.   For purposes of this deposition,

21    I've been calling them Hartford Life and I'll continue to

22    do so.   All right?

23         A    That's fine.

24         Q    You'll understand I mean Hartford Life and

25    Accident Insurance Company, correct?

58

1      A    Yes.

2      Q    Do you recall this booklet?

3      A    Yes.

4      Q    A copy of which is Exhibit 14?  How was it

5   bound?

6      A    How was it bound?

7      Q    Yes.

8      A    You mean -- it was bound along the left side.

9      Q    Was it stapled?

10     A    No.

11     Q    It wasn't stapled?

12     A    No.

13     Q    How was it bound?  Was it looseleaf?

14     A    No.  It -- I can't describe it.  It had a

15   spine on it and it was just bound together.  It was not

16   three-ring or anything like that.

17     Q    All right.  Did it remain the same from the

18   time you received -- you first received it through the

19   time you left HSB's employ?

20              MR. SUSSMAN:  Object to the form.

21              MR. DURHAM:  Object to the form.

22              MS. MEYER:  I will withdraw it.

23   BY MS. MEYER:

24     Q    Was the booklet, Exhibit 14, disseminated to

25   all employees of HSB?

59

1         A    Yes.

2         Q    How?

3         A    By mail for employees who were -- for people

4    who were already employed.  At the time this became

5    effective it was sent out by mail and --

6         Q    To their home addresses?

7         A    Yes, this one went to home addresses and for

8    new hires it was given to them during their new hire

9    orientation as part of their benefits packet.

10        Q    So you had a copy of it for every employee?

11        A    Uh-huh, yes.

12        Q    As of when?

13        A    Do you mean when was it distributed, initially

14   distributed to employees?

15        Q    Yes.

16        A    The specific date I don't recall, but it was

17   sometime I believe in the first half of 1998.

18        Q    It wasn't upon commencement of the policy's

19   coverage, was it?

20                    MR. DURHAM:  Object to the form.

21                    MR. SUSSMAN:  Join.

22        A    It was not sent out on January 1st, 1998, no.

23   BY MS. MEYER:

24        Q    January 1st, 1998 was when this policy began

25   to cover all employees of Hartford Steam Boiler, right?

60

1       A    Yes.

2       Q    You didn't have the booklet January 1st of

3  1998, did you?

4       A    No, we did not.

5       Q    You're saying you had it sometime in the first

6  half of 1998?

7       A    Yes.

8       Q    And as soon as you got it, you disseminated it

9  to all employees?

10      A    Very shortly thereafter, yes.

11      Q    By mailing it to their homes?

12      A    Yes.

13      Q    All right.  And what you mailed them was this

14  29-page booklet, correct?

15      A    In that particular mailing, yes, that's what

16  they got.

17      Q    What do you mean by, "In that particular

18  mailing"?  Why did you so limit your answer?

19      A    Because there are subsequent mailings, benefit

20  mailings we would do from time to time to employees.  It

21  sometimes went to their homes, sometimes went through

22  interoffice mail, but when this went out it went out via

23  mail to their homes.

24      Q    When you say from time to time, how was it

25  decided to do a mailing?

61

1          A    If there was benefit information we needed to

2    disseminate to employees, it didn't always happen at

3    regular intervals, but when it did happen we would do a

4    distribution.

5          Q    What kind of information would you need to

6    disseminate to employees?

7          A    Some of it was mandatory, you know, Department

8    of Labor disclosures, semiannual reports, various things

9    throughout the year that we needed to notify employees

10   of.

11         Q    So, is this booklet certificate what you sent

12   to Mr. Hartranft in response to his 2000 request for the

13   policy?

14         A    It was among the things that I sent to him,

15   yes.

16         Q    As you sit here today, are you certain of

17   precisely what you sent him?

18              MR. SUSSMAN:  Objection to the form of

19   the question.

20         A    Could I be 100 percent certain of every page

21   that went to him?  No.  My intention was to send him the

22   plan document, which included the policy as well as --

23   BY MS. MEYER:

24         Q    The policy meaning Exhibit 14?

25              MR. DURHAM:  Object to the form.

62

1        A    There were subsequent endorsements that went

2    with this policy that would also have been included

3    before that was sent to him, state-specific endorsements,

4    things that were subsequently issued by The Hartford.   I

5    don't see them here.

6    BY MS. MEYER:

7        Q    Right.   But you believe you sent Mr. Hartranft

8    all of those endorsements?

9        A    Yes.

10       Q    And what else?   Anything else?

11       A    The plan document, this policy included

12   endorsement and disability application forms.

13       Q    "This document" meaning Exhibit 14?

14       A    Exhibit 14 and all the subsequent endorsements

15   I don't see here and the long term disability

16   application.   That's my recollection of what I sent him.

17       Q    And you sent them on June 30th of 2000?

18       A    That's what I would imagine, yes, by looking

19   at the date of my e-mail.

20       Q    You would imagine?   You don't know?

21       A    For certain, I can't guarantee that that's the

22   day it was sent, but that certainly is what I indicated

23   in my e-mail.

24       Q    So, did you send it within a few days after

25   June 30th?

63

1       A   It would have gone out either that day or very

2   shortly thereafter.

3       Q   All right.  Fair enough.  Did you subsequently

4   send him additional plan documents in any separate

5   mailing?

6       A   I don't recall.

7       Q   You may have, you may not have?

8       A   Yes.  But I don't specifically recall any

9   subsequent information that I sent him.

10      Q   What did you do in response to Mr. Hartranft's

11  appeal of the denial of short term disability benefits?

12              MR. DURHAM:  Object.  Before you answer

13  that, can you read it.

14              (The record was read by the court

15  reporter.)

16              MR. SUSSMAN:  Objection to the form.

17              MR. DURHAM:  Thank you.

18      A   I'm not sure I understand your question.  You

19  mean when he wrote back to me and said -- are you saying

20  in response to his letter of Exhibit 12?

21              MS. MEYER:  Let's rephrase the question.

22  BY MS. MEYER:

23      Q   You received Exhibit 12 from Mr. Hartranft,

24  correct?

25      A   Yes.

64

1     Q  On its face it said, "Subject:  Appeal of STD

2  denial," correct?

3     A  Yes.

4     Q  Did you understand that Mr. Hartranft intended

5  to appeal the denial of STD benefits?

6     A  Yes.

7     Q  What did you do in response?

8     A  I believe I sent him an e-mail.  I don't have

9  a copy in front of me, so I can't tell you exactly what

10  it says, but I believe I sent him an e-mail reviewing

11  with him the information we used to come to that

12  determination as well as forwarding the information that

13  we just discussed.

14     Q  Okay.  Did Mr. Hartranft provide further

15  documents or information?

16          MR. SUSSMAN:  Objection to the form.

17     A  With this letter, no.

18  BY MS. MEYER:

19     Q  Do you know whether he subsequently submitted

20  additional documentation to support his STD claim?

21     A  He did not submit additional information that

22  I recall to the disability committee.

23     Q  Did he submit it to someone else at Steam

24  Boiler connected to the STD appeal?

25     A  Not that I'm aware of.  Or that I recall.

65

1    Q    Did the disability committee consider any new

2    information that it had not considered the first time?

3        A    I believe the issue of his attendance record

4    was considered upon the appeal, when we were considering

5    overturning of the appeal.  I believe that's the point at

6    which that was brought to light.  Again, the sequence is

7    a little jumbled, but I believe that's what happened.

8        Q    What was brought to light?

9        A    The issue of his attendance card.  It's in the

10   file and I -- it's somewhere.  There is an attendance

11   card for 1999.  It would have been what I believe was

12   brought to light when the committee was reconsidering his

13   STD claim.

14       Q    And what did that 1999 attendance card

15   indicate to you?

16       A    That there was a period of absence towards the

17   end of his employment.

18               MS. MEYER:  Would you mark this, please.

19               (Plaintiff's Exhibit 15 marked for

20   identification and described in the index.)

21   BY MS. MEYER:

22       Q    Showing you what's been marked Exhibit 15.  Do

23   you recognize it?

24       A    Yes.

25       Q    Is it an e-mail that you sent to each of the

66

1    members of the disability committee?

2         A    Yes.

3         Q    You sent it on or about July 10, 2000,

4    correct?

5         A    Yes.

6         Q    And it referred to Mr. Hartranft's appeal,

7    correct?

8         A    Yes.

9         Q    I'm going to talk about the appeal of his STD

10   disability denial at this point and when I say appeal,

11   that's what I'll be referring to, correct?

12        A    Okay.

13                  MR. DURHAM:  Object to the form.

14                  MR. SUSSMAN:  Object to the form.

15                  MR. DURHAM:  I thought that's what we

16   were talking about throughout.

17   BY MS. MEYER:

18        Q    What did you mean by the parenthetical, "The

19   STD plan still gives full discretion to the committee"?

20   What did that mean?

21        A    I think that was a term to remind the

22   committee the short term disability plan is still a short

23   term disability, even though the long term disability was

24   not done, so the appeal was to be determined or reviewed,

25   I should say by the committee itself.

67

1     Q    And discretion to the committee meant -- did

2     it mean anything else to you?  Did the committee have

3     absolute unfettered discretion to either grant or deny

4     benefits on the appeal?

5     A    Well, if I can take a minute, let me just

6     refer to the document.  It should state in there.

7     Q    Do you mean Exhibit 3?

8     A    Exhibit 3, yes.

9              MR. DURHAM:  By appeal, you mean the STD

10    appeal, correct?  Object to the form.

11    A    I'm trying to find the specific reference in

12    the plan.  I'm not quickly finding it, but in that

13    Exhibit 3, the administration section on page HSB0130,

14    "Administration of the plan shall be the responsibility

15    of the disability committee."

16              MR. SUSSMAN:  Off the record for a

17    second.

18              (Discussion off the record.)

19    BY MS. MEYER:

20    Q    Take all the time that you need looking at

21    Exhibit 3, but I would like you to tell me what was the

22    basis for your telling the committee that you still had

23    discretion and by discretion you meant?

24    A    I mentioned earlier that the committee didn't

25    meet to review STD claims.  This was an unusual situation

68

1   because it was a retrospective review.  So, perhaps that

2   was my way of letting them know that we still had to

3   review each claim as well as each appeal.

4        Q   What did you mean by full discretion to the

5   committee?

6        A   It means that the committee had the ability to

7   either overturn or uphold the denial.

8        Q   Is there something in Exhibit 3 that describes

9   the discretion of the disability?

10       A   The Administration section, 4.1 on page 130,

11   indicates, "Administration of the plan shall be the

12   responsibility of the disability committee."

13       Q   Have you taken the time to make a thorough

14   review of Exhibit 3?

15       A   Based on what I've seen, that's probably the

16   most -- yes, based on this review, that's what I found.

17       Q   Okay.  So there's nothing else in Exhibit 3

18   that tells you the extent of the discretion of the

19   disability committee; is that correct?

20               MR. SUSSMAN:  Object to the form.  That

21   was not her testimony.

22               MR. DURHAM:  Object to the form.

23       A   Based on what I found.

24   BY MS. MEYER:

25       Q   Based on your understanding of Exhibit 3 --

69

1                    MR. SUSSMAN:  Objection.

2           A    Based on what I've seen, yes.

3    BY MS. MEYER:

4           Q    Based on your understanding of Exhibit 3,

5    there is nothing else that describes the extent of the

6    discretion of the disability committee, correct?

7                    MR. SUSSMAN:  Object.  Mischaracterizes

8    the testimony.

9           A    Based on what I've seen in my three-minute

10   review of this document, that's the extent of what I've

11   been able to find as far as what describes the

12   committee's discretion.

13   BY MS. MEYER:

14          Q    I don't want to limit the time you can spend

15   reviewing Exhibit 3.  I believe you read through it a

16   couple of times while we've been sitting here waiting for

17   your answer and I want to make sure that you take all the

18   time you need to answer the question.  Whether there is

19   any other -- anything else in Exhibit 3 that made you

20   indicate the extent of the discretion of the committee,

21   anything else that you understand to describe the extent

22   of the discretion of the disability committee?

23                   MR. SUSSMAN:  Objection to the form of

24   the question.

25          A    That is my understanding, yes.

75

1   BY MS. MEYER:

2       Q   How did you hear that?

3       A   I don't recall.

4       Q   When did you hear it?  While the disability

5   committee was still considering his appeal?

6       A   I honestly don't remember.

7               MS. MEYER:  All right.

8               (Plaintiff's Exhibit 18 marked for

9   identification and described in the index.)

10  BY MS. MEYER:

11      Q   Showing you what's been marked Exhibit 18.  Do

12  you recognize that document?

13      A   Yes.

14      Q   What is it?

15      A   Looks like notes from another conversation

16  that I had with Jim Rowan regarding his vote, if you

17  will, on whether to uphold or overturn the denial.

18      Q   Is it correct that Mr. Rowan voted to overturn

19  the denial?

20      A   Yes.

21      Q   Ultimately, that was a unanimous vote, wasn't

22  it?

23      A   The vote itself was unanimous, yes.

24      Q   So, all seven members of the disability

25  committee voted to grant short term disability benefits

76

1    to Mr. Hartranft, correct?

2        A    Yes, although there were dissenting opinions,

3    but the ultimate vote resulted in the overturning of the

4    denial.

5        Q    Was the vote unanimous?

6        A    The vote itself was unanimous, yes.

7        Q    There's a comment here that says, "Bernie

8    should have passed the information on."

9        A    Yes.

10        Q    Do you recall that discussion with Mr. Rowan

11    about Bernie passing information on?

12        A    Vaguely, yes.

13        Q    Do you know what information he was talking

14    about?

15        A    I believe he was referring to the diagnosis.

16        Q    Parkinson's disease, you mean?

17        A    Yes, the information meaning he should have

18    shared with the next supervisor that Mr. Hartranft had an

19    illness.

20        Q    Was he conveying an opinion that having an

21    illness meant the company had some kind of liability?

22            MR. SUSSMAN:    Objection to the form.

23    BY MS. MEYER:

24        Q    I'm just perplexed by this.  If you can just

25    clarify what Mr. Rowan said to you, I would appreciate

82

1    attendance was kept?

2           A    Generally, no.

3           Q    All right.  You didn't do anything to find out

4    how they kept attendance, correct?

5                     MR. SUSSMAN:  Objection to the form.

6           A    Well, standardly, attendance would be kept on

7    the attendance card and that's what we had as a record of

8    his attendance.  We just had no documentation for that

9    period of absence.

10   BY MS. MEYER:

11          Q    The disability committee met again, correct?

12                    MR. SUSSMAN:  Objection to the form.

13   BY MS. MEYER:

14          Q    After July 26th, 2000.

15          A    Subsequent to this meeting, I don't recall if

16   there was another meeting or if there was just a vote.

17                    (Plaintiff's Exhibit 21 marked for

18   identification and described in the index.)

19   BY MS. MEYER:

20          Q    Again, the documents are mainly to help

21   refresh your recollection of what happened.  All right?

22   Did the disability committee meet again after July 26th,

23   2000?

24          A    Yes, we did.  We met on August 16th.

25          Q    Of 2000?

83

1     A   Of 2000.

2     Q   All right.  And do you recognize Exhibit 21?

3     A   Yes.

4     Q   What is it?

5     A   It's the minutes from the August 16th, 2000

6 meeting.

7     Q   It says administrative committee meeting, but

8 that is the disability committee, correct?

9     A   Correct.

10    Q   All right.  And taking a look at this note, is

11 it accurate as to its description of the meeting?

12    A   Yes.

13    Q   You distributed copies of the employees

14 disability plan?  We're talking about Exhibit 3 at this

15 point.

16               MR. DURHAM:  Object to the form.

17               MR. SUSSMAN:  Objection to the form.

18    A   Specifically, I don't recall.  It's likely

19 that I would have distributed Exhibit 3 along with

20 Exhibit 14.

21 BY MS. MEYER:

22    Q   Exhibit 14 is the booklet on long term

23 disability benefits, correct?

24    A   Correct.

25    Q   It's likely that you would have distributed

84

1    that to the disability committee at this time?

2          A    Yes.

3          Q    Why?

4          A    Because it is included with the plan by

5    reference.

6          Q    It's included with the short term disability

7    plan?

8          A    It's included with the disability plan which

9    encompasses both short and long term.

10          Q    Okay.   Was that for the purpose of finding a

11    definition of disability?

12          A    That's what the notes would indicate, yes.

13          Q    Is the disability -- is the definition of

14    disability the same under the short term disability and

15    under the long term disability plan?

16          A    No, it's not.

17          Q    What's the difference?

18          A    Let me refer you to the definition in Exhibit

19    14.   For long term disability on page 8 of Exhibit 14

20    total disability is defined as, "During the elimination

21    period of time within the next 24 months you are

22    prevented by accidental bodily injury, sickness, mental

23    illness, substance abuse, or pregnancy, from performing

24    the duties of your occupation, and as a result you're

25    earning less than 20 percent of your pre-disability

1    earnings, unless engaged in a program of rehabilitative

2    employment approved by us."

3            Q    Was that the definition that the committee

4    needed to consider?

5            A    No.  We were reviewing the claim for short

6    term disability.  This is the long term disability

7    definition.

8            Q    But you felt it important to provide this

9    definition to the committee?

10                MR. SUSSMAN:   Objection.

11           A    When I presented the plan document, I

12   presented this as part of the plan document because it is

13   incorporated into the plan by reference.  So, the

14   disability plan, if you look on the cover of Exhibit 3,

15   it says, "Employees' Disability plan."  That is inclusive

16   of short and long term.  The long term disability,

17   beginning of the long term disability section and the end

18   of it on page HSB0130, section 3 says, "Long term

19   disability" -- excuse me, "Disability benefits shall be

20   determined in accordance with the terms of the group

21   insurance policy in effect between The Hartford," et

22   cetera, et cetera.  That's what this document represents

23   (indicating).

24   BY MS. MEYER:

25           Q    That's what Exhibit 14 represents?

86

1          A    Correct.

2          Q    Okay.

3          A    So, this (indicating) was a package.  This

4     together was the plan.

5          Q    Exhibit 3 and 14?

6          A    Yes.

7          Q    Referring back to Exhibit 21.  It says you

8     updated the members on an issue raised at the last

9     meeting.  Was that the attendance issue?

10         A    Yes.

11         Q    All right. And after you updated them, there

12    was a brief discussion; is that correct?

13         A    Yes.  Uh-huh.

14         Q    And a unanimous vote to rescind the denial of

15    STD benefits, correct?

16         A    Correct.

17                   (Plaintiff's Exhibit 22 marked for

18    identification and described in the index.)

19    BY MS. MEYER:

20         Q    Showing you what's been marked Exhibit 22.  Do

21    you recognize that document?

22         A    Yes, I recognize this document.

23         Q    What is it?

24         A    It's feedback that I gave to the committee

25    between the August 16th meeting and the July, I believe

90

1    please.

2                    (Plaintiff's Exhibits 23 and 24 marked

3    for identification and described in the index.)

4    BY MS. MEYER:

5        Q    Showing you what's been marked Exhibit 23.   I

6    want to refer you to the bottom half of the page.

7    Starting with the planet.   What is that?

8                    MR. SUSSMAN:   Objection to the form.

9    BY MS. MEYER:

10       Q    Do you recognize that, that logo or icon?

11       A    No.   I don't.

12       Q    All right.   That's not something you put on

13   your e-mails?

14       A    No.

15       Q    All right.   Starting with where it says,

16   "JODILUSSIER@HSB.COM."   Was that your e-mail address?

17       A    Yes.

18       Q    On or about July 14, 2000, did you send an

19   e-mail to Merily Tine, Subject:   Endorsements?

20       A    It appears that way, yes.

21       Q    Why?

22       A    I was requesting a copy of the endorsements

23   that accompany our LTD plan.

24       Q    Why?

25       A    More than likely it's because I was running

91

1   low on my supply of some of them and I needed a clean

2   supply.

3        Q   You indicated you had some but not all of

4   them?

5        A   Yes.

6        Q   Do you know which ones you had and which ones

7   you didn't have?

8        A   I don't recall.  There were many of them.

9        Q   All right.  And you're not sure what you had

10   and what you didn't have?

11        A   No.

12        Q   You also asked for a clean copy of the policy

13   of incorporation; is that right?

14        A   Yes.

15        Q   You had only a fax?

16        A   Yes.

17        Q   Do you know why you had only a fax?

18        A   I don't.  I don't remember.

19        Q   All right.  But as of July 14 of 2000, is it

20   accurate to say that you did not have a complete copy of

21   the endorsements for the long term disability policy?

22                MR. DURHAM:  Object to the form.

23                MR. SUSSMAN:  Join.

24                MR. DURHAM:  Are you asking her whether

25   on that day she didn't, or are you saying she never did

92

1    up until then?  Object to the form.

2        A    It's possible that I was out of some of them

3    and I just needed another supply.

4            MS. MEYER:  That may be possible.  Would

5    you please read back the question and I'm going to ask

6    you not to make speaking objections that appear at a

7    minimum to be pumping the witness as to what kind of

8    answer she should make.

9            MR. DURHAM:  I can't get you to react to

10   some of my questions to try to clarify something to move

11   it along.

12           MS. MEYER:  Let's not do speaking

13   objections.  They are improper.

14           MR. DURHAM:  I'm not going to agree

15   that's what I was doing.  I was putting on the record

16   what my objection was so you could clarify your question

17   for the witness, particularly since my client was

18   supposed to start at 1:30.

19           MS. MEYER:  If you want to move this

20   deposition along -- would you please read back my

21   question to the witness.

22               (The record was read by the court

23   reporter.)

24        A    What I am imagining happened is I looked at

25   the list of endorsements that should have been included

93

1    with the plan, did not have a complete copy of each one.

2    We sent them -- we would send them out, we would give

3    them out and send them out to our branch offices as

4    needed.  I could have run out of a supply of them and

5    asked her for a clean copy of each of them.  That's my

6    guess about why I made this request.

7    BY MS. MEYER:

8        Q    Why did you send them out to branch offices?

9        A    Because some of the endorsements were state

10   specific.  The majority of the endorsements related to

11   state laws, things that you had to -- things that you had

12   to put into the policy because of certain state

13   requirements.  So, for example, if we had a branch in

14   Missouri and it was a Missouri state law, we would send

15   them a supply of the Missouri state endorsement plan.

16       Q    When you say a supply of Missouri

17   endorsements, why a supply of them?

18       A    So they could give them out to new hires.

19       Q    They were given out routinely to new hires?

20       A    Yes.

21       Q    What about existing employees?

22       A    My recollection is when we got the complete

23   set of endorsements, we did a mailing.  I mentioned

24   earlier that we would from time to time give mailings to

25   employees with benefit information included.  This is a

94

1    perfect example of when we would have a mailing to

2    employees.  When endorsements became available to us, we

3    would do a mailing to the employees.

4         Q    Did endorsements become available one at a

5    time?

6              MR. SUSSMAN:  Objection to the form.

7         A    I honestly don't remember how much the

8    endorsements came to be.  I remember getting them in a

9    clump at one point shortly after the policy went into

10   effect and we would have likely not done state-specific

11   mailings at that point.  Just for administrative ease we

12   would have sent all of them to all employees, and then as

13   various things became available, we would send them out

14   on an as-needed basis.

15   BY MS. MEYER:

16        Q    So if you got a single endorsement, you would

17   send them to all employees?

18        A    If it applied to all employees, yes,

19   absolutely.

20        Q    You would mail it to every existing employee?

21        A    Yes, depending on -- yes, yes, that's

22   accurate.

23        Q    And those are the employees who are currently

24   employed, correct?

25        A    Yes.

95

1    Q    You didn't send it to past employees, did you?

2    A    Not that I recall, no.

3    Q    So if someone was no longer employed at

4    Hartford Steam Boiler, you wouldn't send them an

5    endorsement?

6    A    No, because they weren't eligible for the plan

7    any longer.

8    Q    And then you provided the packet of

9    endorsements to new employees?

10   A    Yes.

11   Q    In response to your e-mail, Exhibit 23, lower

12   half of Exhibit 23, did you in fact receive a clean copy

13   of the policy of incorporation?

14   A    I believe I did, yes.

15   Q    All right.  Are you looking at Exhibit 24 at

16   this point?

17   A    Yes.

18   Q    That's a transmittal letter, isn't it?

19   A    What do you mean by that?

20   Q    Withdrawn.  That's a letter that reflects that

21   somebody sent you something, correct?

22   A    Yes.

23   Q    Someone at The Hartford sent you, according to

24   this letter, a clean copy of the policy endorsement --

25   policy of incorporation along with the corresponding

96

1    endorsements, correct?

2          A    Yes, uh-huh.

3          Q    Did you check to see whether you received all

4    the endorsements at the time?

5          A    I don't specifically recall.  It's likely that

6    I did.

7          Q    All right.  And what did you do with them?

8          A    I would have kept them with our benefit

9    information for the regular distribution.

10                    (Plaintiff's Exhibit 25 marked for

11    identification and described in the index.)

12    BY MS. MEYER:

13         Q    Did you assist Hartford Steam Boiler in

14    responding to requests for admissions in this case?

15         A    I'm not sure what you mean by that, requests

16    for admissions.

17         Q    You don't recall a document called requests

18    for admissions?  You didn't review one?

19         A    No.  I did have a phone conversation with

20    someone at HSB who had been requested to respond to

21    something.  I didn't physically see the document.  We did

22    it by phone.  It could be that's what it was.

23         Q    In the last month or so?

24         A    Yes.

25         Q    Who was the person at HSB that you spoke with

97

1    about it?

2        A    Debbie Bartos.

3        Q    Who is Debbie Bartos?

4        A    She is currently the manager of benefits

5    administration at HSB.

6        Q    Showing you what's been marked Exhibit 25.  Do

7    you recognize that document?

8        A    Yes.

9        Q    What is it?

10       A    It's a letter apparently that came to HSB back

11   in March accompanying a subsequent endorsement to the

12   policy -- well, endorsement to the policy that was

13   issued, but it was effective with the date of the change

14   to a fully insured plan.  I recall this.  I don't

15   remember getting the letter with it, but I recall the

16   endorsement.

17       Q    You recall, when you say "this"?

18       A    I recall the endorsement.

19       Q    You recall the endorsement which is the second

20   page of Exhibit 25?

21       A    Yes.

22                  MR. DURHAM:  Object to the form.

23   BY MS. MEYER:

24       Q    For the record, page 25 is a two-page exhibit,

25   correct?