98

1          A    Yes.

2          Q    The second page says, "Endorsement" close to

3     the top, correct?

4          A    Yes.

5          Q    And what do you recall about it?

6                    MR. SUSSMAN:  Objection to the form.

7          A    I recall that it was part of our agreement

8     with The Hartford.

9     BY MS. MEYER:

10         Q    Could you define that more carefully?

11                   MR. DURHAM:  Wait.  Were you finished

12    with your answer?

13                   MS. MEYER:  That's all right.  I did

14    interrupt her.  You're correct.

15    BY MS. MEYER:

16         Q    Could you explain to me what it means, you

17    were familiar that it was part of The Hartford?

18                   MR. DURHAM:  Wait a minute.  You're

19    moving on.  She should finish the first answer.

20         A    The first answer is I recall this and it was

21    part of our agreement with The Hartford.

22    BY MS. MEYER:

23         Q    Do you recall the endorsement?

24                   MR. DURHAM:  You're interrupting her

25    again.

1                    MS. MEYER:   Mr. Durham, you're the one

2     who is interrupting the deposition.

3                    MR. DURHAM:   Why don't you let the

4     witness answer.   You've interrupted her.

5                    MS. MEYER:   You don't want the --

6                    MR. DURHAM:   I want you to abide by what

7     you stated at the beginning of the deposition, which is

8     you will let the witness finish her answer before you ask

9     the next question.

10                    MS. MEYER:   I want the record to be sure

11    when she said, "this" she is referring to the

12    endorsement.

13                    MR. DURHAM:   That would be a follow-up

14    question once she finishes her answer.

15                    MS. MEYER:   When you take a deposition

16    you can do it that way.

17    BY MS. MEYER:

18        Q    Ms. Lussier --

19        A    I recall the endorsement.   The endorsement was

20    part of our agreement with The Hartford.   I don't

21    specifically recall getting this letter with the

22    endorsement, but I do recall the endorsement, and when I

23    say that it was part of our agreement with The Hartford,

24    it was part of what we entered into when we changed the

25    nature of our contract with them on January 1st of '98.

100

1    Part of that agreement was fully insuring the plan and

2    part of that is giving The Hartford the authority to

3    determine benefit eligibility and to determine and

4    interpret the terms of the plan.

5         Q    Now, you had what's called an ASO agreement

6    previously with The Hartford, correct?

7         A    Correct.

8         Q    That was administrative services?

9         A    Yes.

10         Q    And that related to the long term disability

11    benefits also, correct?

12         A    Yes.

13         Q    And that was prior to January 1st, 1998,

14    correct?

15         A    Correct.

16         Q    Under that agreement, The Hartford determined

17    eligibility for long term disability benefits also,

18    correct?

19         A    Under that arrangement, they would receive

20    claims, they would adjudicate claims and pay claims.    If

21    there was a denial of the benefit or if there was an

22    appeal of a determination, it came back to Hartford Steam

23    Boiler.

24         Q    For what?

25         A    For review.    In other words, if somebody

101

1    appealed the claim, appealed the denial, for example, it

2    would come back to the disability committee for review

3    under the fully insured arrangement that went into effect

4    on January 1st of '98.  All adjudication determinations

5    as well as appeals went to The Hartford.

6         Q    What other changes were made in the agreement?

7              MR. DURHAM:   Object to the form.

8              MR. SUSSMAN:   Join.

9         A    Do you mean other changes that were made to

10   the plan on January 1st of '98?

11   BY MS. MEYER:

12        Q    Yes.

13        A    There were other plan provisions that changed

14   on that date.  I can't specifically recall what they are

15   because I don't have the document in front of me, but

16   there were other changes that were made, minor changes.

17        Q    Minor changes, for example, that the maximum

18   benefit was changed from 15,000 to 20,000?

19        A    Exactly.  Those types of things.  You know,

20   plan provisions as opposed to major, you know, contract

21   or funding changes.

22        Q    Okay.  We will take a look at a couple of

23   them.  But referring back to the endorsement that's the

24   second page of Exhibit 25.  When you say this was part of

25   the agreement, is that reflected in writing somewhere

102

1    other than in this endorsement?

2                    MR. DURHAM:   Object to the form.

3                    MR. SUSSMAN:   Objection to the form.

4        A    Maybe I'm not clear on what you mean was it

5    reflected in writing.   When Hartford Steam Boiler agreed

6    to -- well, when they agreed to make this change -- let

7    me back up.   It is in the policy.

8    BY MR. MEYER:

9        Q    It is in Exhibit 14?

10       A    There is wording in here that would indicate

11   that and that is consistent with that endorsement in

12   Exhibit 14.

13       Q    What wording?

14       A    If I can just have a moment.

15       Q    You may have as long as you like.

16       A    Okay.   I'm going to refer you to three

17   separate pages in Exhibit 14.   First on page 15.

18       Q    Yes.

19       A    Middle of the page there is a subheading for

20   disability benefits.   "When do benefits become payable?

21   You will be paid a monthly benefit if items one through

22   five."   If you look at item five it says, "You submit

23   proof of loss satisfactory to The Hartford."   That would

24   indicate that it is The Hartford that requires

25   satisfactory proof of loss.   That would be one item that

103

1    is consistent with The Hartford having discretion to make

2    claim determinations.

3            If you look at page 22, the second question

4    down, it says, "What recourse do you have if your claim

5    is denied?"  The response is, "On any denied claim you

6    and/or your representative may appeal to The Hartford for

7    a full and fair review," and after items one, two and

8    three it says, "A decision will be made by The Hartford."

9    I believe that, you know, that's also intended to

10   indicate that they have authority to make decisions.

11           Finally, on page 28 under, "Claim procedures,"

12   skipping down to the last paragraph, the first sentence

13   says, "A decision will be made by the insurance company

14   no more than 90 days after receipt of due proof of loss."

15           So, does that answer your question?

16       Q   I'm not sure, to tell you the truth.  Those

17   are the three clauses in Exhibit 14 that you believe

18   indicate the same thing as what's indicated in the second

19   page of Exhibit 25 --

20               MR. DURHAM:  Object to form.

21   BY MS. MEYER:

22       Q    -- is that The Hartford has full discretion

23   and authority to determine eligibility for benefits?

24               MR. SUSSMAN:  Objection to the form.

25               MR. DURHAM:  Object to the form.

104

1    BY MS. MEYER:

2         Q    Correct?  That's what you've told us, isn't

3    it?

4         A    I've stated where the plan indicates language

5    that is consistent with this endorsement.

6         Q    Language consistent.  Okay.  Is there anything

7    else in Exhibit 14 that you believe indicates that The

8    Hartford has full discretion and authority to determine

9    eligibility for benefits?

10                   MR. DURHAM:  Object to the form.

11        A    No.  Not based on that review, no.

12   BY MS. MEYER:

13        Q    Do you know whether anyone at Hartford Steam

14   Boiler participated in preparing the endorsement that's

15   the second page of Exhibit 25?

16        A    I don't believe so, no.

17        Q    You did not?

18        A    I personally did not, no.

19        Q    Do you know whether anyone at Hartford Steam

20   Boiler decided to draft this endorsement to add to the

21   policy?

22                   MR. SUSSMAN:  Object to the form of the

23   question.

24        A    I don't believe so, but I don't think that was

25   added because there was a decision to add.  I think it

1    was required language that had to accompany the policy.

2    BY MS. MEYER:

3        Q    What do you mean by that?

4        A    Well, the cover letter, the first paragraph of

5    the letter from The Hartford says, "During a recent

6    examination of the policy it was discovered that certain

7    ERISA language had been omitted in the booklet's policy

8    certificate," and the problem, and all certificates do

9    not contain this language, so my understanding of this

10   letter is it was added because it was required to be, not

11   because it was a conscious decision to add it.

12       Q    Required by what?

13       A    Required by ERISA.

14       Q    So your understanding was this was a legal

15   requirement to add this?

16               MR. SUSSMAN:  Objection to the form.

17               MR. DURHAM:  Object to the form.

18       A    It was a legal requirement that particular

19   language be part of the plan.

20   BY MS. MEYER:

21       Q    For the language in the endorsement to be part

22   of the plan?

23               MR. SUSSMAN:  Object to the form.

24       A    I believe so.  I'm not an attorney.  I can't

25   specifically say one way or the other.  I'm giving you my

106

1   understanding based on this letter.

2   BY MS. MEYER:

3       Q    It wasn't a decision of anyone at Hartford

4   Steam Boiler?

5                    MR. SUSSMAN:   Objection.   Asked and

6   answered.

7       A    No.

8   BY MS. MEYER:

9       Q    Who negotiated the policy you have with

10  Hartford Steam Boiler?

11      A    Who negotiated the long term disability policy

12  with The Hartford?

13      Q    Yes.

14      A    Do you mean the change to the policy that took

15  effect in 1998?

16      Q    Yes, January 1st, 1998?

17      A    I was involved in that, also had a broker

18  involved with that.

19      Q    Whose name is what?

20      A    John O'Connell.

21      Q    Is he with the Smith Agency?

22      A    C.M. Smith.

23      Q    Do you mind if I call it the Smith Company to

24  make it easier for me?

25      A    That's fine.

107

1              MS. MEYER:  Would you mark that, please.

2              (Plaintiff's Exhibit 26 marked for

3    identification and described in the index.)

4    BY MS. MEYER:

5         Q    As sit here today, do you have any specific

6    recollection of negotiations related to the language,

7    "The Hartford has full discretion and authority to

8    determine eligibility for benefits and to construe and

9    interpret all terms and provisions of the group insurance

10   policy"?

11        A    I'm sorry, could you repeat the beginning of

12   that question.

13        Q    I was reading from the endorsement actually in

14   Exhibit 25.

15        A    I understand.  But the --

16        Q    What I'm asking is whether you have any

17   specific recollection of negotiations related to the

18   language, "The Hartford has full discretion and authority

19   to determine eligibility for benefits and to construe and

20   interpret all terms and provisions of the policy"?

21              MR. SUSSMAN:  Object to the form.

22              MR. DURHAM:  Objection to the form.

23        A    We did not negotiate the language, no.

24   BY MS. MEYER:

25        Q    Showing you what's been marked Exhibit 26,

108

1    and, as ever, please take your time reviewing it.

2               Have you reviewed the entirety of Exhibit 26?

3        A    Not read every word, but I have reviewed the

4    page, yes.

5        Q    Do you know what it is?

6        A    It appears to be the policy with The Hartford,

7    long term disability including the policy of

8    incorporation and all of the endorsements.   I'm not

9    familiar with this cover letter.   I've never seen it

10   before.

11       Q    The cover letter which is the first page of

12   Exhibit 26, you're not familiar with?

13       A    No.

14       Q    The remaining pages of Exhibit 26 you are

15   familiar with?

16       A    Yes.

17       Q    You're here as the representative of Hartford

18   Steam Boiler who has knowledge of the terms and

19   conditions of the policy, so I want to give you plenty of

20   time to make sure that we understand whether this

21   document reflects all of the terms and conditions of the

22   policy, the long term disability plan.   All right?

23       A    Uh-huh.

24       Q    Take your time.

25               (Pause.)

109

1    BY MS. MEYER:

2        Q    Have you thoroughly reviewed Exhibit 26?

3        A    I have reviewed it, yes.

4        Q    Do you know what it is?

5        A    Yes.

6        Q    What is it other than the first page which

7    you've indicated you haven't seen before?

8        A    It is the policy of incorporation between The

9    Hartford -- Hartford Life, whatever we're calling it,

10   Hartford Life and Accident, Hartford Steam Boiler, all

11   the correspondencing endorsements and the policy itself

12   for long term disability.

13       Q    And is this what relates to Exhibit 3 from

14   what you testified earlier?

15                MR. SUSSMAN:   Objection to the form.

16   BY MS. MEYER:

17       Q    What is incorporated into Exhibit 3?

18       A    I believe so, yes.   I'm questioning whether or

19   not we included the policy of incorporation, but I

20   believe we did.   I believe we took this in its entirety.

21       Q    You don't know?

22       A    I can't confirm whether the policy of

23   incorporation was included.   However, the booklet, what

24   we're calling the booklet as well as the endorsements

25   were all intended to be part of what we're referring to

110

1    as Exhibit 3.

2          Q    Is there anything else that was part of the

3    long term disability benefit plan for Hartford Steam

4    Boiler employees in 1999?

5                     MR. DURHAM:    Other than Exhibit 26?

6    BY MS. MEYER:

7          Q    Correct.    Exhibit 3 and Exhibit 26.

8          A    When you say anything else that was a part of,

9    you mean that would have been encompassed in the

10    document?

11          Q    The plan.

12          A    No.

13          Q    The long term disability benefit plan.    All

14    right.    Actually, it says, "Employees' Disability plan"

15    on the cover of Exhibit 3.

16          A    Correct.

17          Q    All right.

18          A    Exhibit 3, Exhibit 26.

19          Q    Exhibit 3 and Exhibit 26 together, then, are

20    what's referred to in Exhibit 1 as the disability income

21    plan; is that correct?

22          A    Yes.

23          Q    And there's nothing else that was ever

24    included, correct?

25          A    Not to my knowledge.

111

1                    MR. SUSSMAN:  Object to the form.

2    BY MS. MEYER:

3         Q    Exhibit 25, did you tell me when you first saw

4    that endorsement?

5         A    I did not tell you when I first saw it, no.  I

6    don't remember when I first saw it, quite frankly.  It

7    would have been sometime in '99.

8         Q    How do you know it would have been sometime in

9    '99?

10        A    But I don't specifically remember.  Well, I

11   would imagine if this was sent to me or sent to HSB in

12   '99 that that's when I would have received it.

13        Q    You just imagine it, you don't know?

14                   MR. SUSSMAN:  Objection.

15                   MR. DURHAM:  Object.

16        A    I can't say for certain when it landed on my

17   desk.

18   BY MS. MEYER:

19        Q    Do you know whether you sent the endorsement

20   that's the second page of Exhibit 25 to all HSB

21   employees?

22        A    I believe that I did, yes.

23        Q    You believe you did that when you received it?

24        A    Or shortly thereafter.

25        Q    Define "shortly thereafter."

1          A    I can't define it specifically.  I mentioned

2     earlier we would do mailings from time to time to

3     employees with benefit information.  They were not done

4     on regular intervals, so I can't say specifically when

5     this would have gone out.

6          Q    Okay.  The letter wasn't addressed to you, was

7     it?

8          A    No, it wasn't.

9          Q    Did the people at The Hartford know you?  Did

10    they know you were the person at Hartford Steam Boiler --

11                  MR. SUSSMAN:  Object to the form of the

12    question.

13    BY MS. MEYER:

14         Q    -- who handled the benefit plans?

15                  MR. SUSSMAN:  Objection.  What people?

16         A    I don't know if they would have known who to

17    send it to or not.  I don't know who sent this.  Sue

18    Adamowicz sent it.

19    BY MS. MEYER:

20         Q    Do you know Sue Adamowicz?

21         A    No.

22                  (Plaintiff's Exhibit 27 marked for

23    identification and described in the index.)

24    BY MS. MEYER:

25         Q    Showing you what's been marked Exhibit 27.

113

1    Are you familiar with that document?

2           A    Yes.

3           Q    What is it?

4           A    It was the Hartford's proposal to Hartford

5    Steam Boiler to fully insure the long term disability

6    plan.

7           Q    Does it describe the terms of the agreement

8    between The Hartford and The Hartford Steam Boiler --

9    Hartford Life and Hartford Steam Boiler?

10                  MR. DURHAM:   Object to the form.

11          A    I wouldn't say it describes the terms of the

12   agreement.   It describes the terms of the proposal which

13   typically only includes things that -- they are mostly

14   financially related.   This is more of a financial

15   proposal than anything else.   I couldn't say that it

16   describes the terms of the entire agreement.

17   BY MS. MEYER:

18          Q    What does?

19          A    The policy would describe the terms of the

20   agreement.

21          Q    And is the policy Exhibit 26?

22                  MR. DURHAM:   Object to the form.

23          A    That would describe the terms of the

24   agreement, yes.

25   BY MS. MEYER:

1          Q    Exhibit 26 is all of the terms of the

2     agreement?

3                    MR. SUSSMAN:  Objection to the form of

4     the question.

5                    MS. MEYER:  Withdrawn.

6     BY MS. MEYER:

7          Q    Does Exhibit 26 contain all of the terms of

8     the long term disability benefit agreement between

9     Hartford Steam Boiler and Hartford Life?

10                    MR. SUSSMAN:  Objection to the form of

11    the question.

12         A    It is -- yes, it is intended to include all of

13    the terms of the agreement.

14                    MS. MEYER:  What's your objection to

15    form?

16                    MR. SUSSMAN:  When you say all of the

17    terms of the agreement, I don't know what that means.

18    Which -- what agreement that's referring to.

19                    MS. MEYER:  That is your objection to

20    form?

21                    MR. SUSSMAN:  Yes.

22                    MR. DURHAM:  Mr. Court Reporter, can you

23    tell me, is there a pending question?

24                    MS. MEYER:  As far as I know, there

25    isn't.  Moreover, I have no further questions for this

132

1    BY MS. MEYER:

2        Q    The committee had discretion to uphold the

3    denial of benefits, correct?

4        A    Yes.

5        Q    Had full discretion to do so, correct?

6        A    Yes.

7        Q    Why did they overturn it?

8        A    They overturned it because of the period of

9    absence that was unaccounted for.  We did not deem him

10   disabled but we could not -- we were giving him the

11   benefit of the doubt, essentially, for that period of

12   time.  We could not determine whether that was or was not

13   a period of disability, and because we could not

14   determine that it wasn't, we gave him the benefit of the

15   doubt and paid the benefits.

16       Q    And the benefits were approximately $30,000?

17       A    I don't have the number in front of me.  That

18   sounds like it could be right.

19                    MS. MEYER:  I have nothing further.

20                    MR. SUSSMAN:  No questions.

21                    MR. DURHAM:  No questions.

22                    (The deposition concluded at 1:37 p.m.)

23

24

25

EXHIBIT A

# DISABILITY
# INCOME TRACK

*The Disability Income Plan provides you with regular
income if you are unable to work due to an illness,
injury or pregnancy. You are covered whether the
disability is job-related or non-job-related. Depending
on the nature and duration of your disability, two
different types of benefits are available — Short-Term
Disability and Long-Term Disability.*

O-3    Short-Term Disability Benefits

  Eligibility
  Applying for STD Benefits
  Amount and Duration of Benefits

O-4    Pregnancy-Related Disability

  Disability Period
  Leave of Absence
  Benefits
  Return to Work
  Severance

O-4    Long-Term Disability Benefits

  Eligibility
  Amount of Benefits
  Additional LTD Coverage
   Enrollment for Increased LTD
  Other Income Benefits
  Applying for LTD Benefits
  Duration of Benefits
  Duration of Benefits for a Mental or Nervous
   Condition, Alcoholism or Substance Abuse

O-6    Rehabilitation Benefits

O-7    Continuation of Your Other Company
   Benefits

O-7    Additional Information

  What the Plan Does Not Cover
  When Coverage Ends

**EXHIBIT**

*PJE 1 (TD)*
*DEH 9/30/03*

1/99

O-1

O-2

# Short-Term Disability Benefits

Short-Term Disability (STD) benefits are payable if you are ill or injured and are unable to work.

## Eligibility

You are eligible for STD benefits if you are an active HSB employee regularly scheduled to work at least 17 ½ hours a week. Your eligibility for payment of STD benefits begins on the first day of the month after you start work at HSB as shown in the tables at the right. If you start work on the first day of a month, your eligibility begins on the first day of the following month.

HSB pays the full cost of Short-Term Disability protection.

## Applying for STD Benefits

If you are unable to work because of illness or injury, contact your supervisor to request STD benefits. HSB may request proof of your disability.

## Amount and Duration of Benefits

Your STD benefits are based on your length of service and your salary. STD benefits are payable for up to 26 weeks.

- "Service" means your continuous years of service, including approved leaves of absence and periods when you are receiving STD benefits. Periods during which you are receiving Long-Term Disability benefits are not counted.
- "Salary" means your base rate of pay as of the date you became disabled, excluding overtime, bonuses or any amounts paid under any other HSB benefit program. Your pre-tax contributions to the Thrift Incentive Plan are included as salary.

Benefits for employees who work at least 17 ½ hours but less than 37 ½ hours per week are calculated in proportion to the number of hours they work weekly.

If you are a **non-exempt employee**, STD benefits available to you during any 12-month period are shown below.

| If your service equals: | | You'll receive biweekly: 100% of your salary for | and 60% of your salary for |
|---|---|---|---|
| Less than 6 months | | 0 days | 0 days |
| At least | Less than | | |
| 6 months | 1 year | 10 days | 0 days |
| 1 year | 2 years | 20 days | 110 days |
| 2 years | 3 years | 30 days | 100 days |
| 3 years | 4 years | 40 days | 90 days |
| 4 years | 5 years | 50 days | 80 days |
| 5 years | 6 years | 65 days | 65 days |
| 6 years | 7 years | 80 days | 50 days |
| 7 years | 8 years | 95 days | 35 days |
| 8 years | 9 years | 110 days | 20 days |
| 9 years | 10 years | 120 days | 10 days |
| 10 years or more | | 130 days | 0 days |

If you are an **inspector or an exempt employee**, including a marketing or account executive, STD benefits available to you during any 12-month period are shown below.

| If your service equals: | | You'll receive biweekly: 100% of your salary for | | and 60% of your salary for | |
|---|---|---|---|---|---|
| | | 5-day work week | 7-day work week | 5-day work week | 7-day work week |
| Less than 1 year | | 10 days | 14 days | 0 days | 0 days |
| At least | Less than | | | | |
| 1 year | 2 years | 30 days | 42 days | 100 days | 140 days |
| 2 years | 3 years | 60 days | 84 days | 70 days | 98 days |
| 3 years | 4 years | 90 days | 126 days | 40 days | 56 days |
| 4 years | 5 years | 120 days | 168 days | 10 days | 14 days |
| 5 years or more | | 130 days | 182 days | 0 days | 0 days |

O-3

# Pregnancy-Related Disability

# Long-Term Disability (LTD) Benefits

Your full STD benefit is payable only once during any 12-month period. If you use all of your STD benefit in any 12-month period, you are not eligible to receive additional STD benefits until the beginning of the following 12-month period. You may be eligible for Long-Term Disability benefits in this case.

All federal, state and local income taxes are withheld from STD benefits, as are FICA (Social Security) taxes.

In addition, your STD benefit is adjusted to reflect other sources of disability income, including:

- Workers' compensation;
- State disability benefits, including mandatory no-fault automobile insurance;
- Any other income benefits program provided by HSB contributions to a plan or program; and
- Social Security benefits or other benefits under a federal or state disability program.

## Example of STD Benefits

Paul is a 54-year-old, non-exempt employee who has completed eight years of service. His monthly salary is $1,500 (or $346 a week), and he is unable to work due to illness.

During the first 26 weeks of disability, Paul would receive these STD benefits:

- $346 a week for the first 22 weeks (110 days divided by five days per work week)
- $207 a week for the next four weeks (60% of $346)

After Paul has been disabled for six months, he may qualify for Long-Term Disability (LTD) benefits if he meets the plan's definition of total disability, as explained on page O-5.

Employees disabled by pregnancy, childbirth and related medical conditions are eligible for the same Short-Term Disability benefits as employees disabled by other medical conditions.

## Disability Period

A woman's disability period starts when her physician states, in writing, that she may no longer work. The period continues until the physician states, in writing, she may return to work.

The amount and duration of disability benefits depends on the employee's length of service and exempt/non-exempt status. See the schedule of STD benefits on the previous page.

## Leave of Absence

You may be eligible for additional unpaid leave under the Family and Medical Leave Act (FMLA). See page F-7 for additional information on FMLA.

The Long-Term Disability Plan assures you of a continuing regular income if you have a prolonged illness or injury. LTD benefits can continue a portion of your pay throughout your total disability period.

## Eligibility

You are eligible for LTD benefits if you are an active HSB employee regularly scheduled to work at least 17 1/2 hours a week. LTD benefits are payable provided you are "totally disabled" and were previously eligible for and received payment for STD benefits for that period of disability.

### Definition of Total Disability

Under the LTD portion of the Disability Income Plan, you will be considered totally disabled:

- During the first 24 months of a period of disability, if you cannot perform the duties of your own occupation because of illness, injury or pregnancy. "Your own occupation" means the type of work in which you are engaged and is not limited to the actual job you performed before your period of disability started.
- After two years, during the same period of disability, if you cannot work at any gainful occupation for which you are or may reasonably become suited by education, training or experience.

O-4

**For employees hired on or after 1-1-98:**

## Pre-existing Condition Limitation

No benefit will be payable under the plan for any disability that is due to a pre-existing condition until the employee has been covered by the plan for 12 continuous months. A pre-existing condition is defined as any injury, illness, mental illness, pregnancy or episode of substance abuse for which an employee received medical care during the 6-month period immediately prior to his or her effective date of coverage.

## Amount of Benefits

If you qualify, the LTD Plan assures you of a monthly benefit equal to 60% of your monthly salary. HSB pays for this portion of your LTD coverage. The salary used to determine your LTD benefit is the same as the salary used to determine your STD benefit, as described on page O-3.

## Additional LTD Coverage

If you are not an HSB senior officer, you may elect to purchase additional LTD coverage equal to 10% of your monthly salary, for a total of 70%. The cost for the additional LTD coverage is based on your age and salary.

## Enrollment for Increased LTD

To increase your LTD coverage to 70% of your monthly salary, you must complete a Flextrack enrollment form available from your Branch Office or the Home Office Human Resources Department within 30 days of your date of hire. The Flextrack enrollment form indicates your LTD coverage choice and authorizes HSB to deduct your cost for coverage from your paycheck. If you enroll within 30 days of your date of hire, your coverage will go into effect immediately.

If you don't enroll for additional LTD within the initial 30-day period, or if you want to decrease your LTD coverage, you cannot do so until the annual Open Enrollment period or until you have a life status change. (See page H-4 regarding life status changes.)

**For employees hired on or after 1-1-98:**
The pre-existing condition limitation described in column one applies to the additional 10% of coverage as well.

To increase your LTD coverage after the initial 30-day period, you must complete an Evidence of Insurability form, available from the Human Resources Department. You are responsible for the cost of obtaining this statement from your doctor. You will be enrolled for the additional LTD coverage only if your evidence of insurability is approved.

## Other Income Benefits

Your LTD benefits are adjusted to reflect other income benefits, which include:

- Payments under any Workers' Compensation law, occupational disease law or similar legislation;
- Payments under any disability, cash sickness benefit or similar legislation;
- Primary Social Security benefits; and
- HSB Employee Retirement Plan benefits.

The minimum benefit payable from the LTD Plan is $100 a month. The maximum is $20,000 a month.

If you receive long-term disability benefits, you must apply for Social Security disability benefits. If Social Security benefits are denied, you must follow the process established by the Social Security Administration to reconsider the denial. If benefits are denied again, you must request a hearing before an Administrative Law Judge of the Office of Hearing and Appeals. ITT Hartford, HSB's LTD administrator, can offer assistance with the process once your LTD benefits have been approved.

## Example of LTD Benefits

Using the same assumptions described in the earlier STD example, Paul, who has not elected to obtain the additional coverage, is approved for LTD benefits. He also becomes eligible for a monthly Social Security disability benefit of $400. His LTD benefit would be calculated as follows:

| | | |
|---|---|---|
| 60% x $1,500 | = | $900 |
| minus | | |
| Social Security | | |
| disability benefit | – | $400 |
| | | |
| LTD Plan benefit | | $500 |

Paul would receive $400 a month from Social Security and $500 a month from the LTD Plan. So, his total income from both sources is $900 — or 60% of his monthly salary.

O-5

# Rehabilitation Benefits

## Applying for LTD Benefits

If you remain disabled, contact your supervisor four to six weeks before your STD is due to end for the necessary form(s) to apply for LTD benefits. You may also be required to have a medical examination by an approved physician.

## Duration of Benefits

Long-term disability benefits are payable at the end of each month while an employee remains totally disabled, but not beyond one of the following, whichever occurs first:

- the date on which the employee fails to furnish proof that total disability continues,
- the date on which the employee refuses to permit a required medical examination,
- the date on which the employee no longer has a disability, as defined in this section, or
- the date determined from the table below.

## Duration of Benefits for a Mental or Nervous Condition, Alcoholism or Substance Abuse

There is a 24-month limitation of long-term disability benefits for alcoholism, non-medical use of narcotics, or a mental or nervous condition. However, if you are confined to a hospital or other qualified institution for one of these conditions, your long-term benefits will continue as long as you remain confined.

Generally, if you return to work, your LTD benefits will either cease or be reduced by the amount of pay you receive for such work. However, if your disability is such that vocational rehabilitation or part-time work could help you ultimately return to full-time gainful employment, your LTD benefits provide some incentive to undertake such activities.

If you work under a rehabilitation program approved by the Plan Administrator, your LTD benefit will be recalculated. During rehabilitative employment, you will receive your normal LTD benefit reduced by 50% of your earnings from rehabilitative employment.

For example, if your LTD benefits are $900 before rehabilitative employment and you begin to earn $400 a month in an approved rehabilitative employment program, your LTD benefit will be recalculated as follows: $900 - $200 (50% x $400) = $700.00

When you add your recalculated LTD benefit to your earnings from rehabilitative employment, your total monthly income increases to $1,100.

| Commencement of employee's disability (when STD benefits begin) | Benefit payments for disabled employee will end: |
|---|---|
| Prior to age 62 | At age 65 |
| After age 62 but prior to age 63 | When benefits have been paid for a period of 48 months |
| After age 63 but prior to age 64 | When benefits have been paid for a period of 42 months |
| After age 64 but prior to age 65 | When benefits have been paid for a period of 36 months |
| After age 65 but prior to age 66 | When benefits have been paid for a period of 30 months |
| After age 66 but prior to age 67 | When benefits have been paid for a period of 27 months |
| After age 67 but prior to age 68 | When benefits have been paid for a period of 24 months |
| After age 68 but prior to age 69 | When benefits have been paid for a period of 21 months |
| After age 69 | When benefits have been paid for a period of 15 months |

# Continuation of Your Other Company Benefits

If you are approved for and begin receiving LTD benefits, you will also be eligible for continued coverage under certain other HSB benefit plans. Here's how your coverage continues under the HSB benefit plans during your total period of disability.

- Your Basic and Supplemental Employee Life Insurance coverage will continue at no cost to you if you are approved by Aetna for a premium waiver. When you retire, your life insurance coverage amount will be reduced to a flat $7,500 at no cost to you.
- Your medical and dental benefits will continue for you and your covered dependents. Deductions for these benefits can be taken from your monthly disability check.
  If you become eligible for Medi-care while on LTD, Medicare coverage is primary.
- You will become 100% vested in your entire Thrift Incentive Plan account on the day you are approved for LTD benefits. At that time your contributions will stop and you will be eligible to receive a distribution of your account balance.
- LTD benefits end at your normal retirement age, unless your disability begins after age 62 (see Duration of Benefits on previous page). You will be eligible to receive

Retirement Plan benefits once you reach your normal retirement age. You receive service credit for the date of your disability to your normal retirement age. Refer to the Retire-ment Plan section (page V-5) of this handbook for additional information on retirement benefits after a period of total disability.

# Additional Information

## What the Plan Does Not Cover

The Disability Income Plan will not pay STD or LTD benefits for any disability:

- Incurred before you became eligible for STD or LTD benefit coverage;
- Connected with service in the armed forces of any country or due to acts of war or participation in a riot or civil commotion;
- Incurred while on a leave of absence;
- Related to employment with another employer;
- Due to a self-inflicted injury; or
- Due to committing or attempting to commit an assault, battery or felony.

**For employees hired on or after 1-1-98:**

## Pre-existing Condition Limitation

No benefit will be payable under the plan for any disability that is due to a pre-existing condition until the employee has been covered by the plan for 12 continuous months. A pre-existing condition is defined as any injury, illness, mental illness, pregnancy or episode of substance abuse for which an employee received medical care during the 6-month period immediately prior to his or her effective date of coverage.

Benefits will be payable while you are confined to a hospital or other qualified institution for alcoholism or the non-medical use of narcotics or hallucinogenic drugs. If you are not so confined, benefits will be paid for no more than a total of 24 months for all periods of such disability during your lifetime.

## When Coverage Ends

Your coverage under the Disability Income Plan ends if your employment with HSB ends or in the event the plan is terminated.

O-8